[Cite as *Alford v. E. Ohio Gas Co.*, 2014-Ohio-2134.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BRIAN ALFORD, ET AL. | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Plaintiffs-Appellees/Cross-Appellants | Hon. Sheila G. Farmer, J.<br>Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 2013AP030014 |
| THE EAST OHIO GAS COMPANY<br>DBA DOMINION EAST OHIO | |
| | O P I N I O N |
| Defendant-Appellant/Cross-Appellee | |

CHARACTER OF PROCEEDING: Appeal from the Tuscarawas County
Common Pleas Court, Case No.
2010CT101185

JUDGMENT: Affirmed in part; Reversed in part;
and Remanded

DATE OF JUDGMENT ENTRY: May 12, 2014

APPEARANCES:

For Plaintiffs-Appellees/Cross-Appellants     For Defendant-Appellant/Cross-Appellee

THOMAS W. CONNORS                             JEROME W. COOK
Black, McCuskey, Souers & Arbaugh             MANJU GUPTA
220 Market Abenue South, Suite 1000           McDonald Hopkins LLC
Canton, Ohio 44702-2116                       600 Superior Ave, Suite 2100
                                              Cleveland, Ohio 44114-2653

*Hoffman, P.J.*

{¶1}  Defendant-Appellant/Cross-Appellee The East Ohio Gas Company dba Dominion East Ohio appeals the October 9, 2012, November 15, 2012, and February 14, 2013 judgment entries entered by the Tuscarawas County Court of Common Pleas granting judgment in favor of Plaintiffs-Appellees/Cross-Appellants Brian and Erin Alford, husband and wife, and their children.  The Alfords have filed a cross-appeal.

STATEMENT OF THE FACTS AND CASE

{¶2}  Plaintiffs-Appellees/Cross-Appellants Brian and Erin Alford, husband and wife, and their children (hereinafter "Alfords") initiated a complaint against Defendant-Appellant/Cross-Appellee The East Ohio Gas Company dba Dominion East Ohio (hereinafter "Dominion"), asserting multiple claims as will be discussed infra.

{¶3}  At all times pertinent hereto, the Alfords' residence was located approximately 400 yards to the western side of the Guernsey and Clay Compressor Stations operated by Dominion.  Brian Alford purchased the real property at issue herein located at 550 Gravel Lick Road, S.W. Port Washington, Ohio in 1998, together with his father for the price of $80,000.  Brian Alford's father subsequently passed away, and Brian Alford married Erin Alford.  Brian and Erin Alford moved onto the property, making improvements thereto and establishing the properly as their family home.  The residence in which the Alfords lived was a 1,152 square foot double-wide trailer improved to have the appearance of a log cabin.

{¶4}  In January of 2007, a new engine was installed by Dominion at the Clay Compressor Station.  The engine was a 945-horsepower internal combustion engine, which replaced a 633- horsepower Caterpillar internal combustion engine.  During the

same year, the Guernsey Station, which had previously been operated manually, began operating via computer. Both the Clay and Guernsey Compressor Stations were permitted facilities and operating legally under the regulatory authority of the Ohio EPA.

{¶5} It is undisputed prior to the changes, the Alfords did not experience excessive noise, vibration and/or fumes on their property. However, the Alfords claimed subsequent to the 2007 changes at the Guernsey and Clay compressor stations, they began experiencing excessive noise, fumes and vibration on their property.

{¶6} The Alfords asked Dominion to enclose the Clay Compressor Station due to excessive noise, fumes and vibration after the installation of the new engine. Dominion, however, attributed some of the noise to other businesses in the area, including the Tennessee Gas Metering and Regulation Station, the DTI Gilmore Metering and Regulation Station, and the DTI Gilmore Compressor Station, a Title V facility.

{¶7} The Alfords then contacted Brent Breon, Dominion's Manager of Gas Operations for the geographic area. Breon committed he would attempt to obtain capital funding for a sound-deadening building for the Clay Station, if this would placate the Alfords' complaints.

{¶8} The Alfords proceeded to file a complaint with the Ohio EPA on July 16, 2007, and on July 25, 2007.

{¶9} Dominion proceeded to erect a sound-deadening enclosure around the Clay Compressor Station. The enclosure was completed on January 18, 2008.

{¶10} Three months later, the Alfords requested a sound-deafening enclosure or barrier be erected between their property and the Guernsey Station. The Alfords further complained of continuing vibrations emanating from the Clay Station.

{¶11} Erin Alford then contacted her congressman. Shortly thereafter, Dominion obtained reports from sound consultants regarding conditions at the compressor stations and options to address the problems. A number of options were recommended, including a silencer on the blowdown vents, a soundwall and replacement of exhaust mufflers. An engineer from Dominion elected to plant a row of trees with admission he had no knowledge as to whether the measure would effect noise on the property.

{¶12} The Alfords testified at trial they were able to determine the noise effecting their property resulted from the Guernsey and Clay Compressor Stations.

{¶13} The Alfords then requested Dominion purchase their property. Dominion refused.

{¶14} Aside from the Alfords' writ of mandamus claim which was tried to the court, their claims for nuisance, trespass, intentional and negligent infliction of emotional distress, negligence and punitive damages proceeded to jury trial. The trial court directed a verdict in favor of Dominion on the Alfords' nuisance, trespass, intentional infliction of emotional distress and punitive damages claims, leaving for the jury's consideration the Alfords' claims for negligence and negligent infliction of emotional distress.

{¶15} The jury returned a verdict in favor of Dominion and against the Alfords on their claim for negligent infliction of emotional distress. On the negligence claim, the

jury found in favor of the Alfords in the aggregate amount of $132,000. Specifically, the jury returned a verdict for damages as follows: 1.) $0 for pain and suffering; 2.) $32,000 for annoyance, injury; inconvenience, endangered comfort, health and safety; 3.) $25,000 for loss of consortium; and 4). $75,000 for injury to real property.[1]

{¶16} On November 29, 2012, Dominion moved the trial court to enter an order for judgment notwithstanding the verdict or in the alternative a new trial solely on the Alfords' claim for negligence. Via Judgment Entry of February 14, 2013, the trial court denied the motion finding reasonable minds could conclude the Alfords were entitled to damages in the amount of $132,000.

{¶17} Dominion now appeals, assigning as error:

{¶18} "I. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT AND/OR FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON COUNT IV OF PLAINTIFFS' FOURTH AMENDED COMPLAINT WHERE THE ALLEGED NEGLIGENT OPERATION AND MAINTENANCE OF THE GUERNSEY AND CLAY COMPRESSOR STATIONS WAS ALREADY THE SUBJECT OF A DIRECTED VERDICT GRANTED IN FAVOR OF DEFENDANT-APPELLANT ON THE PLAINTIFFS' ENTIRE NUISANCE CLAIM (COUNT I OF PLAINTIFFS' FOURTH AMENDED COMPLAINT) THAT INCLUDED, AS ACKNOWLEDGED BY THE PLAINTIFFS AND THE TRIAL COURT, THE THEORY OF QUALIFIED AND/OR PRIVATE NUISANCE PREDICATED ON THE SAME ALLEGATIONS OF NEGLIGENT OPERATION AND MAINTENANCE AND THAT SOUGHT THE SAME DAMAGES.

---

[1] The Alfords elected to abandon the claim for writ of mandamus in favor of accepting the jury's verdict.

{¶19} "II. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT AND/OR FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON COUNT IV OF PLAINTIFFS' FOURTH AMENDED COMPLAINT WHERE PLAINTIFFS PRODUCED NO EXPERT TESTIMONY OR EVIDENCE TO ESTABLISH THE STANDARD OF CARE OR ANY BREACH OF THE STANDARD OF CARE RELATING TO THE OPERATION AND MAINTENANCE OF NATURAL GAS FIRED TURBINE COMPRESSOR STATIONS AND/OR RECIPROCATING INTERNAL COMBUSTION COMPRESSOR STATIONS WHERE THAT STANDARD OF CARE WAS NOT WITHIN THE COMMON KNOWLEDGE OR EXPERIENCE OF THE JURORS.

{¶20} "III. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT AND/OR FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON COUNT IV OF PLAINTIFFS' FOURTH AMENDED COMPLAINT WHERE PLAINTIFFS PRODUCED NO EXPERT TESTIMONY OR EVIDENCE TO ESTABLISH PROXIMATE CAUSE.

{¶21} "IV. THE TRIAL COURT ERRED AS A MATTER OF LAW OR COMMITTED PLAIN ERROR WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON THE LOSS OF CONSORTIUM CLAIM WHERE PLAINTIFFS ADMITTED THAT NO LOSS OF CONSORTIUM CLAIMS WERE PART OF THE ORIGINAL COMPLAINT, PLAINTIFFS EXPRESSLY ANNOUNCED IN RESPONSE TO REQUESTS FOR ADMISSIONS THAT THEY RESERVED THEIR RIGHT TO AMEND TO ADD THESE CLAIMS, BUT WHERE NONE OF THE FOUR SUBSEQUENT AMENDED COMPLAINTS EVER

ADDED CLAIMS FOR LOSS OF CONSORTIUM AND THE TRIAL COURT'S ORDER ALLOWING THE FILING OF THE FOURTH AMENDED COMPLAINT PROHIBITED ANY FURTHER AMENDMENTS.

{¶22} "V. THE TRIAL COURT ERRED AS A MATTER OF LAW OR COMMITTED PLAIN ERROR WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT JUDGMENT NOTWITHSTANDING THE VERDICT ON THE DAMAGES FOR ALLEGED 'ANNOYANCE, INJURY, INCONVENIENCE, ENDANGERED COMFORT, HEALTH OR SAFETY' WHERE THOSE DAMAGES ARE NOT RECOVERABLE IN CASES OF ALLEGED PERMANENT DAMAGE TO REAL PROPERTY AND WHERE PERMANENT INJURY TO REAL PROPERTY WAS THE ONLY TYPE OF REAL PROPERTY DAMAGE FOR WHICH THE JURY RECEIVED AN INSTRUCTION AND WHERE THESE DAMAGES WERE SOUGHT IN COUNT I OF PLAINTIFFS' COMPLAINT THAT WAS ALREADY THE SUBJECT OF A DIRECTED VERDICT IN FAVOR OF DEFENDANT-APPELLANT.

{¶23} "VI. THE TRIAL COURT ERRED AS A MATTER OF LAW OR COMMITTED PLAIN ERROR WHEN IT DENIED DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT AND/OR FOR JUDGMENT NOTWITHSTANDING THE VERDICT ON THE DAMAGES FOR ALLEGED DIMINUTION IN VALUE OF PLAINTIFFS' REAL PROPERTY RESULTING FROM THE ALLEGED PERMANENT DAMAGE TO THAT REAL PROPERTY WHERE PERMANENT INJURY TO REAL PROPERTY WAS THE ONLY TYPE OF REAL PROPERTY DAMAGE FOR WHICH THE JURY RECEIVED AN INSTRUCTION AND WHERE THERE WAS NO EVIDENCE OF DIMINUTION OF VALUE AS THAT METHOD WAS DEFINED BY THE COURT

AND WHERE THESE DAMAGES WERE SOUGHT IN COUNT I OF PLAINTIFFS' COMPLAINT THAT WAS ALREADY THE SUBJECT OF A DIRECTED VERDICT IN FAVOR OF DEFENDANT-APPELLANT.

{¶24} "VII. THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF DEFENDANT-APPELLANT AND/OR COMMITTED PLAIN ERROR WHEN THE TRIAL COURT FAILED TO: (1) INSTRUCT THE JURY THAT DEFENDANT-APPELLANT HAD ASSERTED AFFIRMATIVE DEFENSES; (2) INSTRUCT THE JURY REGARDING WHAT AFFIRMATIVE DEFENSES ARE AND THEIR SIGNIFICANCE; (3) INSTRUCT THE JURY PURSUANT TO THE JURY INSTRUCTIONS REQUESTED AND FILED BY THE DEFENDANT-APPELLANT RELATING TO SUBSEQUENT REMEDIAL MEASURES, AFFIRMATIVE DEFENSES GENERALLY, PROXIMATE CAUSE, COMING TO THE NUISANCE, EQUITABLE ESTOPPEL, FAILURE TO JOIN INDISPENSABLE PARTIES, STATUTE OF LIMITATIONS, DAMAGE, AND A PROHIBITION REGARDING CONSIDERATION OF ANY LOSS OF CONSORTIUM.

{¶25} "VIII. THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF DEFENDANT-APPELLANT AND/OR IT COMMITTED PLAIN ERROR WHEN IT: (1) INSTRUCTED THE JURY EXCLUSIVELY ON THE MEASURE OF DAMAGES FOR PERMANENT INJURY TO REAL PROPERLY; (2) REINTRODUCED NON-ECONOMIC DAMAGES INTO THE NEGLIGENCE CLAIM (COUNT IV) THAT WERE ALREADY A MATTER OF A DIRECTED VERDICT; (3) IMPLIED THAT TRIFLING AND INSUBSTANTIAL DAMAGES THAT COULD NOT BE RECOVERED

UNDER NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS COULD NEVERTHELESS BE PROPERLY AWARDED UNDER THE NEGLIGENCE COUNT."

{¶26} On cross-appeal, the Alfords assign as error:

CROSS-APPEAL

{¶27} "I. THE TRIAL COURT ERRED IN GRANTING DOMINION'S MOTION FOR DIRECTED VERDICT ON THE ALFORDS' PUNITIVE DAMAGES CLAIM.

{¶28} "II. THE TRIAL COURT ERRED IN EXCLUDING SOUND LEVEL TEST RESULTS AND RELATED EXPERT TESTIMONY EVEN THOUGH THE TESTS METHODOLOGY WAS RELIABLE, BY IMPERMISSIBLY WEIGHING THE CREDIBILITY OF THE PERSON WHO CONDUCTED THE TESTS.

{¶29} "III. THE TRIAL COURT ERRED IN GRANTING DOMINION'S MOTION FOR DIRECTED VERDICT ON APPELLEES' TWO ABSOLUTE NUISANCE CLAIMS BECAUSE THERE IS SUBSTANTIAL COMPETENT EVIDENCE SUPPORTING SUCH CLAIMS."

DIRECT APPEAL

I., II, and III.

{¶30} Appellant's first, second and third assignments of error raise common and interrelated issues; therefore, we will address the arguments together.

{¶31} Dominion argues the trial court erred in failing to direct a verdict or grant judgment notwithstanding the verdict as to the Alfords' negligence claim. Count I of the Alfords' Fourth Amended Complaint included claims for both qualified nuisance and private nuisance. Dominion asserts the qualified nuisance claim is negligence based. The trial court directed a verdict in favor of Dominion as to Count I of the Alfords'

complaint.  Dominion maintains because the Alfords' claim for negligence was based upon the same theories, operative facts and damages as the directed out claim in Count I, the Alfords' claim for negligence in Count IV of the complaint should likewise have been directed out as they were "absorbed" by Count I.  Dominion asserts to allow the negligence claim to survive was plain error.

{¶32}  Given the jury's finding in favor of the Alfords on their negligence claim, we find it could be argued the trial court's decision to direct out the Alfords' nuisance claim was inconsistent; therefore error.  Because we find infra, the jury's verdict in favor of the Alfords on their claim for negligence was supported by sufficient evidence, we find Dominion's argument about the trial court's asserted inconsistency of rulings insufficient to amount to plain error.

{¶33}  Dominion next argues the trial court erred in denying its motion for directed verdict and/or JNOV on the Alfords' cause of action for negligence because the Alfords did not produce an expert witness or evidence to establish the standard of care or breach of said standard in this matter.  Also because the Alfords did not produce an expert to establish proximate causation in this matter.

{¶34}  Dominion maintains expert opinion is required in all proceedings involving scientific, mechanical, professional, or like nature, requiring special study, experience or observation not within the common knowledge of laymen.  *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d. 77.  The expert testimony can extend to the ultimate issue.  Id.  Dominion asserts in the absence of a clearly defined standard established by specific regulation or ordinance, introduced and admitted at trial, the standard of care relating to the operation and maintenance of complicated industrial sites like the

Guernsey and Clay Stations is a matter outside the common knowledge and experience of the jury. The emission of noise, fumes and vibrations is a natural result of the ordinary use of the compressors; therefore, Dominion cannot be presumed negligent absent expert testimony establishing the pertinent standard of care and breach thereof.

{¶35} Further, Dominion maintains in order to demonstrate proximate causation, the Alfords needed to introduce expert testimony isolating their contribution from other sources of the total noise, fumes and vibrations impacting their property. Dominion's expert testified an air sampling and a dispersion modeling study would be required. Further, the Alfords' own professed sound expert admitted a sound study using an octave band filter would be required to do so.

{¶36} Dominion maintains the Alfords have not joined as party-defendants all of the noise, fume and vibration emitters situated on either side of them, though their names and distinct existences were well known to them. Accordingly, Dominion contends the jury was improperly permitted to speculate as to the degree to which any of these sources contributed to the total noise, fumes and vibration in the area.

{¶37} The standard of review for both directed verdicts and judgments notwithstanding the verdict are the same as set forth by the Ohio Supreme Court:

{¶38} "The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A). *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 121, 671 N.E.2d 252, 256, fn. 2, citing *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 318-319, 662

N.E.2d 287, 294; and *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338. Civ.R. 50(A)(4) states:

**{¶39}** "'When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.'

**{¶40}** "In *Wagner,* we quoted *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284-285, 21 O.O.3d 177, 178-179, 423 N.E.2d 467, 469, in setting forth the standard for deciding a motion for a directed verdict or for a judgment notwithstanding the verdict:

**{¶41}** "'The law in Ohio regarding directed verdicts is well formulated. In addition to Civ.R. 50(A), it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320 [27 O.O.2d 241, 199 N.E.2d 562] * * *.' *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115 [4 O.O.3d 243, 244, 363 N.E.2d 367, 368].'

**{¶42}** "In *Wagner,* we stated that ' '[t]he 'reasonable minds' test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the claims of the party against whom the motion is directed]. * * * A motion for a directed verdict raises a question of law because

it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence.' *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 68-69, 23 O.O.3d 115, 116-117, 430 N.E.2d 935, 938.' *Wagner,* 77 Ohio St.3d at 119-120, 671 N.E.2d at 255-256."

**{¶43}** *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 693 N.E.2d 271.

**{¶44}** Accordingly, the Alfords' negligence claim stands if it is supported by substantial competent evidence.

**{¶45}** The Alfords' Fourth Amended Complaint reads at Count I,

**{¶46}** "5.***the defendant's facility has emitted noise, vibrations and fumes onto plaintiffs' property at all times of the day and night, which are so excessive as to have caused extensive injury to plaintiffs, their property, and their enjoyment of their property.

**{¶47}** "6.  The noise, vibrations and fumes have caused, and will continue to cause, injury to plaintiffs and their minor children, in that their sleep is disturbed, their ability to work is compromised by lack of sleep, doors and windows cannot be opened to provide ventilation, their outdoor activities are curtailed, their minor children are frightened by sudden bursts of excessive noise, their ability to conduct conversations is impaired and their physical health and well-being has been adversely affected.

**{¶48}** "7.  The excessive noise, vibrations and fumes by defendant, and/or with consent and knowledge, constitutes a nuisance and an unreasonable interference with the rights of plaintiffs and their minor children."

**{¶49}** Count IV reads, in pertinent part:

{¶50} "17. Defendant negligently and recklessly conducted its operations, and maintained an abnormally dangerous condition at 496 Gravel Lick Road, Port Washington, Ohio so as to cause excessive noise, vibrations and fumes to go on plaintiff's property.

{¶51} "18.  As a direct and proximate result of the negligence, recklessness and maintenance of an abnormally dangerous condition by defendant, in permitting the noise, vibrations and fumes to come onto the lands of plaintiff from the lands of defendant, plaintiffs' property and use of property were damages and plaintiffs and their minor children were injured as described above."

{¶52} The essential issue is whether there is substantial competent evidence of record Dominion "failed to use ordinary care to avoid causing injury or damages" to the Alfords.  Ordinary care is "care a reasonably prudent or careful person or corporation would use under the circumstances." Ordinary care is determined by foreseeability, the test for which is "under the circumstances, a reasonably careful person or corporation would have anticipated that the injury or damages were likely to result from the acts or failure to act of Dominion."

{¶53} The Ohio Supreme Court has determined customs, general practice or standard operating procedures are not determinative of whether ordinary care has been exercised,

{¶54} "The recognized function of evidence of customs, general practice or standard operating procedures was pointed out in *Ault v. Hall*, 119 Ohio St. 422, 164 N.E. 518, 60 A.L.R. 128. Paragraphs three and four of the syllabus of that case read as follows:

**{¶55}** "'3. Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence or fix a standard by which negligence is to be gauged, but conformity thereto is a circumstance to be weighed and considered with other circumstances in determining whether or not ordinary care has been exercised.

**{¶56}** "'4. Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact.'

**{¶57}** "Taft, J., in Witherspoon v. Haft, 157 Ohio St. 474, 479, at page 482, 106 N.E.2d 296, at page 301, another case in which it was argued that the defendant had followed customary practice and hence had complied with the standard of care established by others in his trade or calling said:

**{¶58}** "'The real question in each case is whether reasonable minds could come to the conclusion that the defendant's conduct fell below the standard of ordinary care. Customary conduct or methods were circumstances to be considered with other circumstances in determining whether they could. Among the other circumstances to be so considered in each case was the serious danger involved as a consequence of the defendant's conduct. * * *'

**{¶59}** "As we see it, the problem which confronted the trial judge at the close of the evidence in this case was not the lack of evidence of a standard of care but rather the question of whether under the circumstances affirmatively shown by the plaintiff's evidence the defendant's conduct or methods fell short of ordinary prudence.

**{¶60}** "In determining in any given case whether a defendant exercised that care which an ordinarily and reasonably prudent man would have exercised under the same

or similar circumstances, one of the most important of the circumstances is 'the potential danger apparently involved.' Schwer, Admx., v. New York, Chicago & St. Louis Rd. Co., 161 Ohio St. 15, 21, 117 N.E.2d 696, 43 A.L.R.2d 606."

{¶61} *Thompson v. Ohio Fuel Gas Co.* (1967), 9 Ohio St.2d 116, 224 N.E.2d 131.

{¶62} Here, while the details of the machinery were technical, whether it was reasonable to subject the Alfords to excessive noise, vibration, and fumes was not. The issue was addressed in *Amcast Industrial Corporation v. Detrex Corporation*, 779 F.Supp. 1519, (N.D. Ind. 1991),

{¶63} "In Count VI, the plaintiffs allege that the drivers who delivered TCE were negligent. Detrex claims that this count must fail because the plaintiffs present no evidence respecting the applicable standard of care for truck drivers delivering chemicals in the 1980s and 1980s. Detrex contends that expert testimony is required to establish the standard of care for handling TCE. Detrex cites *Ellis v. Smith,* 528 N.E.2d 826, 828 (Ind.App.1988), a medical malpractice action in which the plaintiff claimed that he did not give informed consent for an operation. The court stated that, 'The general rule is that expert medical opinion testimony is required to establish the content of reasonable disclosure unless the situation is clearly within the realm of laymen's comprehension, as where disclosure is so obvious that laymen could recognize the necessity of such disclosure.'

{¶64} "The plaintiffs offer several cases in which the courts have stated that in negligence actions there is one standard of care—that of a reasonable person under the circumstances. *See Neal v. Home Builders, Inc.,* 232 Ind. 160, 111 N.E.2d 713 (1953);

*Central Transport, Inc. v. Great Dane Trailers, Inc.,* 423 N.E.2d 675, 678 (Ind.App.1981); *P–M Gas & Wash Co., Inc. v. Smith,* 178 Ind.App. 457, 383 N.E.2d 357 (1978). The court agrees with the plaintiffs' argument that the reasonable handling of TCE is not beyond the ken of the ordinary layperson. Although the ordinary person is not familiar with the chemical properties of TCE, the ordinary person can understand that TCE is a hazardous substance which should be handled in such a way that it is not released into the environment. Therefore, unlike the situation in medical malpractice cases, in this case, expert testimony on the reasonable standard of care is not a necessary element in the plaintiffs' prima facie case."

**{¶65}** We find from our review of the record there was substantial competent evidence permitting the jury to determine whether a reasonably careful person would have subjected the Alfords to the noise, fumes and vibration presented herein.  We find expert testimony was not necessary.

**{¶66}** Under Ohio law, the burden of proving any claimed apportionment of damages caused by concurrent tortfeasors is on the tortfeasor arguing for apportionment. Upon review of the record, the Alfords presented substantial competent evidence Dominion's actions caused them damage.  Upon a showing a defendant has caused damage, the burden shifts to the defendant to prove any claimed apportionment among tortfeasors.  Accordingly, we find Dominion was not entitled to a directed verdict or JNOV on this basis as to Count IV alleging negligence in the Alford's complaint.

**{¶67}** Dominion's first, second and third assigned errors are overruled.

IV. And V.

{¶68} Dominion's fourth and fifth assigned errors raise common and interrelated issues; therefore, we will address the arguments together.

{¶69} In its fourth assignment of error, Dominion argues the trial court erred in denying their motion for JNOV on the jury's award of damages for loss of consortium. In its fifth assignment of error, Dominion maintains damages for annoyance, discomfort, and inconvenience are not recoverable in cases involving permanent damage to real property measured by diminution in value.

{¶70} In maintaining non-economic damages for annoyance and discomfort are not recoverable when a plaintiff seeks real property damages that are permanent in nature, Dominion cites to *Haynes v. Conrail & Consol. Rail Corp.* 99-CA-6, 1999 WL 1071740, citing *Horrisberger, 102 Ohio App.3d at 499.*

{¶71} In *Horrisberger v. Mohlmaster* (1995), 102 App.3d 494, the Ninth District held,

{¶72} "For a temporary injury to real property, a plaintiff is entitled to recover (1) reasonable restoration costs, *Reeser v. Weaver Bros., Inc.* (1992), 78 Ohio App.3d 681, 691-692, 605 N.E.2d 1271, 1278-1279; (2) compensation for the loss of the use of the property between the time of the injury and the restoration, *Henderson v. Spring Run Allotment* (1994), 99 Ohio App.3d 633, 651 N.E.2d 489; and (3) damages for personal annoyance and discomfort if the plaintiff is an occupant of the property, *Reeser* at 692-694, 605 N.E.2d at 1278-1280. See, also, 4 Restatement of the Law 2d, Torts (1979) 544, Section 929. Each of these elements of recovery represents a separate and distinct type of damage, and the absence of one does not preclude recovery for the

others. See *Henderson* at 641, 651 N.E.2d at 495; citing *Norwood v. Sheen* (1933), 126 Ohio St. 482, 493-495, 186 N.E. 102, 106-107. Accordingly, we have reviewed the sufficiency of the plaintiffs' evidence for each element.

{¶73} "First, we find that the plaintiffs did not introduce any evidence relating to their loss from not being able to use the property injured by the field tile blow-outs. Second, the plaintiffs did not present any evidence of annoyance or discomfort that could be attributed directly to the field tile blow-outs. In the absence of competent evidence on these two elements of recovery, the jury could not have properly awarded damages for loss of the use of the property or for personal annoyance and discomfort.

{¶74} "With respect to damages for restoration of their property, the plaintiffs were required to present proof of restoration costs and proof of the diminution in the fair market value of the property. *Reeser,* 78 Ohio App.3d at 692, 605 N.E.2d at 1278. As explained by the *Reeser* court, a plaintiff's recovery of reasonable restoration costs is 'circumscribed by the limitation that the recoverable restoration cost[s] cannot exceed the difference between the pre-injury and post-injury fair market value of the real property.' *Id.,* restating the general rule set forth in *Ohio Collieries Co. v. Cocke* (1923), 107 Ohio St. 238, 140 N.E. 356, paragraph five of the syllabus. In other words, if restoration costs exceed the diminution in the property's fair market value, then diminution in fair market value becomes the proper measure of restoration damages. Therefore, a plaintiff seeking to recover restoration damages may not rely solely on evidence of restoration costs to meet his burden of proof. Rather, the plaintiff must introduce evidence of restoration costs *and* evidence of the pre-injury and post-injury fair market value of the injured property. In the absence of market value evidence, the

plaintiff generally cannot recover damages for restoration of the injured property. *Reeser* at 692, 605 N.E.2d at 1278; see, also, the discussion in *Reeser* at 686-691, 605 N.E.2d at 1274-1278.

**{¶75}** "The plaintiffs in this case did not introduce any evidence of the pre-injury or post-injury fair market value of their property. Furthermore, we have serious concerns about the scarcity of evidence relating to the plaintiffs' expected restoration costs. Consequently, we are compelled to conclude that the jury's award of compensatory damages was not supported by competent evidence and, therefore, was against the manifest weight of the evidence. See, generally, *Kromer v. Island Recreation Assn., Inc.* (1992), 82 Ohio App.3d 787, 791-792, 613 N.E.2d 664, 666-667."

**{¶76}** In *Haynes v. Conrail & Consol. Rail Corp.*, Nov. 18, 1999, Licking 99-CA-6, 99-CA-12, this Court cited *Horrisberger*, supra, holding,

**{¶77}** "Regarding appellees James J. Snedden, Sr., and James J. Snedden, Jr., the jury awarded compensation for property damage, but not annoyance and discomfort damages. The railroads urge this ruling is supported by the case of *Horrisberger v. Mohlmaster* (1995), 102 Ohio App.3d 494, 657 N.E.2d 534, which allows for recovery of annoyance and discomfort only if there is a temporary injury to real estate. Where, as here, the plaintiffs suffer a permanent loss of home, annoyance and discomfort damages are not warranted."

**{¶78}** Dominion argues a plaintiff's damages for permanent or irreparable damage to property "are limited to" the difference in the market value of the property, including improvements, before and after the injury citing *Ohio Collieries Co. v. Cocke* (1923), 107 Ohio St. 238, 248.  (Appellant's Brief at p.25, emphasis in original).

**{¶79}** The Court in *Ohio Collieres Co*., stated:

**{¶80}** "If the injury is of a permanent or irreparable nature, the measure of damages is the difference in the market value of the property as a whole, including the improvements thereon, before and after the injury. If the injury is susceptible of repair, the measure of damages is the reasonable cost of restoration, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property before and after the injury, in which case the difference in market value becomes the measure."

**{¶81}** We have reviewed *Ohio Collieries* and note nowhere in the page cited by Dominion does the Court use the phrase "limited to". *Ohio Collieries* involved damage to property caused by removal of coal mining structures under the plaintiff's land. The Court noted the property was still being used by the plaintiff and her son. Significantly, there was no suggestion of, let alone claim for, annoyance, inconvenience, or discomfort damages as are asserted in this case. And while such damages are traditionally associated with a nuisance claim, we believe they are separate and apart from the permanent damage to the real estate. We now find they may be properly claimed in a negligence suit for permanent damage to realty in addition to diminution in value.

**{¶82}** Dominion also relies upon *Haynes v. Consd. Rail Corp*. (1999) 199 WL 1071740 citing *Horrisberger v. Mohlmaster* (1995), 102 Ohio App.3d 494 for the proposition recovery of annoyance and discomfort is only allowed if there is temporary injury to real estate.

**{¶83}** The plaintiffs in *Horrisberger* did claim annoyance and discomfort resulting from flooding of their basement and problems with their septic system. However, the Ninth District in *Horrisberger* found no evidence these conditions were related to the defendant's negligent act. With regard to the one claim against the defendant the court found supported by the evidence, the plaintiffs did not present evidence of annoyance or discomfort caused by that act.

**{¶84}** *Haynes v. Conrail and Consolidated Rail Corp.* (1999), 1999 WL 1071740 (Ohio App. 5 Dist.), involved more than forty plaintiffs suing railroads for flood damages. As to the issue of recoverable damages, the *Haynes* opinion is somewhat inherently contradictory.[2] While this Court did affirm the jury verdict denying compensation for annoyance and discomfort to two of the plaintiffs, citing *Horrisberger,* we also affirmed the jury's award for annoyance and discomfort, in addition to property damage awards, for other plaintiffs. To the extent our decision in *Haynes* is understood to stand for the proposition annoyance and discomfort damages are never recoverable when there is a permanent injury to real property, we hereby overrule it.

**{¶85}** Dominion's fifth assignment of error is overruled.

**{¶86}** Upon review of the record, we conclude the Alfords did not plead a loss of consortium claim. The trial court erroneously instructed the jury on the same. We find damages for loss of consortium were improperly granted.

**{¶87}** The fourth assignment of error is sustained.

---

[2] As author of this Opinion, I acknowledge I concurred in the *Haynes* opinion and decision.

VI.

{¶88} In the sixth assigned error, Dominion asserts the trial court erred in denying the motion for directed verdict and/or for judgment notwithstanding the verdict on the damages for alleged diminution in value of the real property resulting from the alleged permanent damage to the real property, citing *Collieries Co.*, supra.

{¶89} Dominion maintains the Alfords failed to introduce evidence as to the value of the real property prior to the permanent injury herein; therefore, the Alfords cannot demonstrate loss. Dominion cites Craig Barnett's admission during his testimony at trial he never assessed or was asked to assess the value of the Alfords' property before and after any particular date. The jury awarded $75,000 in diminution damages for real property to the Alfords, which Dominion argues is the product of speculation and unsupported by the evidence.

{¶90} At trial herein, Mr. Barnett testified:

{¶91} "Q. Mr. Barnett, I'm going to ask you your opinion about the value of the Alford's property without noise. I'm going to ask I your opinions, if you have an opinion, to a reasonable professional certainty regarding what the market value of that residence would be without the effect of the noise conditions.

{¶92} "A. I would and I did state the reasonable market value was $198,000.00.

{¶93} "Q. And is that….

{¶94} "* * *

{¶95} "Q. Is that opinion offered to a reasonable professional certainty?

{¶96} "A. Yes.

{¶97} "Q. And the number that you offered?

{¶98} "A. $198,000.00.

{¶99} "Q. Have you formed an opinion about what - - first off, in that value did you consider mineral rights in any regard?

{¶100} "A. No, I did not.

{¶101} "Q. Have you formed an opinion with respect to the market value that this property would have with taking into account the noise conditions that you experienced and were told about?

{¶102} "A. Yes, I have.

{¶103} "Q. And what is that opinion to a reasonable professional certainty?

{¶104} "A. I do not think I could sell that property under the present conditions, under the present noise conditions as I have heard and been explained to me.

{¶105} "MR. COOK: Objection, move to strike, nonresponsive.

{¶106} "THE COURT: Overruled.

{¶107} "Q. If you would provide a dollar value - - I know you said you couldn't sell it but just for the record what dollar value then would that mean?

{¶108} "A. Zero.

{¶109} "* * *

{¶110} Tr. at 1353-1354; 1355

{¶111} On cross-examination, Mr. Barnett testified:

{¶112} "Q. Now, do you agree with me that fair market value as it's used in property valuation can be defined as the price at which a willing seller is willing to sell and the price at which a willing buyer is willing to purchase having no compulsion to sell or to buy.

**{¶113}** "A. That's correct.

**{¶114}** "Q. And that concept is a different concept than Craig Barnett cannot sell this property, correct?

**{¶115}** "A. Clarify that question. I guess I didn't follow it through.

**{¶116}** "Q. The first part of my question established an agreement between you and I what fair market value means - -

**{¶117}** "A. Right.

**{¶118}** "Q. - - in the industry.

**{¶119}** "A. Right.

**{¶120}** "Q. That concept is not equivalent to 'Craig Barnett can't sell this property,' would you agree with me? Those two concepts are not equivalent?

**{¶121}** "A. I still cannot fathom where you're going with that question. What do you mean by Craig Barnett not being able to sell the property?

**{¶122}** "Q. You testified during direct that you felt the property had a present value of zero.

**{¶123}** "A. Yes, I did.

**{¶124}** "Q. And when questioned about why you said 'I can't sell that property. It's unsalable.' Did you not?

**{¶125}** "A. Yes, I did.

**{¶126}** "Q. And all I'm saying is that rationale is quite different than zero is the present fair market value under the definition used by the industry, correct?

**{¶127}** "A. A fair market value?

**{¶128}** "Q. Yes.

**{¶129}** "A. Yes.

**{¶130}** "* * *

**{¶131}** "Q. Okay.  Again your position is that the Alford property right now is unsalable.

**{¶132}** "A. That's correct.

**{¶133}** "Q. You did not perform any valuation of the Alford property as it existed in 1989 when it was acquired by Brian Alford and his father.

**{¶134}** "A. I did not; no reason.

**{¶135}** "Q. And you did not do a valuation of the value of the property as of November, 2006, did you?

**{¶136}** "A. No.

**{¶137}** "Q. Can you back out of this for a second?  I just want to go over a couple things. Can you highlight this right here?  Can you make that bigger, Brad?

**{¶138}** "Now, at the bottom of your report it says, 'I estimate the market value as defined the real property that is subject of this report to be $198,000.00.'

**{¶139}** "Q. Do you see that?

**{¶140}** "A. Yes, I do.

**{¶141}** "Q. And it says, 'As of 2006,' Do you see that?

**{¶142}** "A. I do.

**{¶143}** "Q. Brad, can you go back up here and open this up?

**{¶144}** "And you indicate here that you are using the tax card for the tax year 2005, do you see that?

**{¶145}** "A. I see that.

{¶146} "Q. Okay. Now, this form says Summary Appraisal Report, Desk Top Underwrite Quantitative Analysis Appraisal Report.' Do you see that?

{¶147} "A. I do.

{¶148} "Q. But this is not an appraisal report, correct?

{¶149} "A. It's a market analysis, sir. The end result is the same.

{¶150} "Q. Well, you're trying to do the same thing as appraisers do but you're not an appraiser.

{¶151} "A. I disagree with that.

{¶152} "Q. Okay, well, we'll get to that, okay?

{¶153} "A. Pardon?

{¶154} "Q. We'll explore that, believe me.

{¶155} "A. I think we should.

{¶156} "Q. But this report says 'Appraisal Report' and you've already told me that you're not licensed or certified to do appraisals in this state, correct?

{¶157} "A. Yes, I did.

{¶158} "Q. Yes. And Fannie Mae, who is an underwriter of mortgage loans, would not accept your market valuation - -

{¶159} "A. No, they would not.

{¶160} "Q. - - for purposes of guaranteeing loans that they bought.

{¶161} "A. And they should not have accepted Mr. Cook's either.

{¶162} "Q. I'm not an appraiser.

{¶163} "A. Excuse me. I didn't mean to flare up. I apologize. I explained to you, Jerry, you're making a great deal about the 2005 - -

**{¶164}** "Q. If you need to explain anything you can do it during re-direct. But right here I'm just saying Fannie Mae itself would not accept a Craig - -

**{¶165}** "A. Jerry - -

**{¶166}** "Q. Excuse me.

**{¶167}** "A. Jerry, was this done for Fannie Mae? Was it done? Was the intent to use it for Fannie Mae?

**{¶168}** "Q. No, but Mr. Barnett, this is being offered as evidence in this case to a jury who doesn't know you from Adam, doesn't know a Fannie Mae desktop underwriter quantitative analysis appraiser report from Adam.

**{¶169}** "A. Fine.

**{¶170}** "Q. And I don't want the jury drawing any conclusions about the value of this report beyond what is justified. And so my question to you is - -

**{¶171}** "Mr. Connors: Objection, Your Honor, to all of that commentary. It's not a question.

**{¶172}** "The Court: I'm going to overrule. He's responding to Mr. Barnett offering something which was unsolicited. So let's get to the question again, Jerry. And Craig, if you'd be kind enough to let the question be propounded and then respond.

**{¶173}** "Q. I'll try to make the questions as succinct as possible. Fannie Mae would not accept your market valuation - -

**{¶174}** "A. They would not.

**{¶175}** "Q. Excuse me, just allow me to finish.

**{¶176}** "A. Okay.

{¶177}  "Q. Would not accept your market valuation in support of any loans that they underwrite.

{¶178}  "A. They would not.

{¶179}  "Q. Okay.  They require certified appraisers.

{¶180}  "A. They do.

{¶181}  "Q. You happen to be using some type of report form here that is available on your computer, correct?

{¶182}  "A. That's correct.

{¶183}  "Q. And you testified that certain information pops up on these forms when the form is retrieved by your secretary?  Do you remember that?

{¶184}  "A. Yeah, because the form I got from my son and when the form came it was pre-printed with the tax year in it and on the bottom the 2006 date.

{¶185}  "Q. Okay.  So you're saying that this 2006 and the reference to 2005 tax year as being the year of the certificate that was used for purposes of the report.

{¶186}  "A. Absolutely

{¶187}  "Q. Those references are not correct.

{¶188}  "A. They're not correct.  They were pre-printed on the form when I got it.

{¶189}  "Q. You would deny that you were assisting the Alford's in pricing their property for sale in 2006.  Would you deny that?

{¶190}  "A. Oh, absolutely.

{¶191}  "Q. You never performed any type of historical research regarding what facilities existed on either side of the Alford property since the '69, '70 period to present, correct?

**{¶192}**  "A. That's correct.

**{¶193}**  "Q. You were not aware of the facilities that existed when Brian Alford and his father purchased the property in 1989.

**{¶194}**  "A. That is correct.

**{¶195}**  "Q. You're not in a position to say then if the $80,000 that Brian Alford and his father paid in 1989 reflected a diminished market value as a result of the location of the property between those two facilities, correct?

**{¶196}**  "A. That's correct.

**{¶197}**  "Q. In other words, to put the question in a more simple form you're not in a position to say whether they got that property cheap because it was between those two commercial facilities, correct?

**{¶198}**  "A. That's correct.

**{¶199}**  "Q. Now, your opinions regarding the diminished value of the Alford property you believe is causally related to something you believe East Ohio Gas has done or has not done, correct?

**{¶200}**  "A. That's correct.

**{¶201}**  "* * *

**{¶202}**  "Q. Okay.  Now, although the report says the valuation date is as of 2006 you're testifying today that the valuation date should be 2011, right?

**{¶203}**  "A. That's correct.

**{¶204}**  "Q. Now, when I asked you when in 2011 you said August to September, 2011.

{¶205}  "A. I don't believe I said that.  I had been there earlier than August.  Or did you ask me the last time I was there?

{¶206}  "Q. Well, do you recall me asking you this. 'All right, let's focus on Defendant's Exhibit 2.  Okay.  And I'll try to isolate all the errors in it.  First, the date, the effective date of the report as stated on the very bottom of the page is incorrect.'  And you answered yes, that is.  'Question: Instead of 2006 it's supposed to be what?'  And you answered 2011.  And I asked you, 'Any particular date in 2011?'  And your answer was, 'I would date it August 2011 to September 2011.'  Okay?  Do you recall that testimony?

{¶207}  "A. Yes, I recall that.

{¶208}  "Q. And then I said 'Why that date.'  And you said 'Because that was when it was concluded.'

{¶209}  "A. That's when it was done.

{¶210}  "Q. And I asked you then, 'Okay, when was it completed, what day?'  And you didn't - - you admitted that you didn't put that date on there, right?

{¶211}  "A. That's correct.

{¶212}  "Q. I pressed you for a particular date and you said 'Well, I'm gonna throw out September 5, 2011.'  Do you remember that?

{¶213}  "* * *

{¶214}  "Q. For your engagement though in this case you have not performed a before and after comparative market study of the Alford property at any two specific points in time, correct?

{¶215}  "A. No, I have not.

{¶216} "Q. Now, your opinion regarding the general market decline of real estate values during the period that we were addressing at your deposition was based upon your experience as a broker/owner of Barnett Real Estate.

{¶217} "A. That's correct.

{¶218} "Q. And your comparative market study sought to ascertain or develop an opinion regarding the fair market value of the Alford property as of approximately September 5, 2011.

{¶219} "A. That's correct.

{¶220} "Q. And your opinion regarding that value was $198,000.00.

{¶221} "A. That's correct.

{¶222} "* * *

{¶223} "Q. Your report or comparative market analysis, indicates that, in your opinion, the value is $198,000.00 but nowhere in your report is there any mention of noise, correct?

{¶224} "A. That's correct.

{¶225} "Q. Yet you believe that the fair market value at present is zero.

{¶226} "A. That's correct.

{¶227} "Q. So the part in your - - that part that's missing from the report is how do you get from $198,000.00 to zero, correct?

{¶228} "A. That's also correct.

{¶229} "Q. And your explanation of how you get from $198,000 to zero is what?

**{¶230}** "A. How are we going to find a buyer other than a deaf couple because in the state of Ohio now you've got to do a property disclosure. It's required by law. The noise is going to have to be disclosed.

**{¶231}** "Q. So that would have to be on the MLS?

**{¶232}** "A. Yes.

**{¶233}** "Q. As like a cautionary statement on the MLS, something like that?

**{¶234}** "A. Well, it's on the property disclosure. Everybody's gotta sign it before it closes.

**{¶235}** "Q. So again, is your rationale that Craig Barnett can not find a buyer or that there is no hypothetical buyer out there?

**{¶236}** "A. My rationale is there is no buyer for the property.

**{¶237}** "Q. At any price other than to give it away.

**{¶238}** "A. Yeah, you got it.

**{¶239}** "* * *

**{¶240}** "Q. So what Craig Barnett is saying is that there's not a buyer out there who would take the land even for a buck. That's what you're saying.

**{¶241}** "A. Craig Barnett is saying that that value of that property is diminished because of the noise to no appreciable value.

**{¶242}** "Q. To no appreciable value.

**{¶243}** "A. Right."

**{¶244}** Tr. at 1386-1387; 1392-1397; 1398-1399; 1400-1401; 1419; 1422

**{¶245}** We find based upon the foregoing, there was sufficient testimony presented as to the market value of the real property both prior to the alleged injury to

the property and following the alleged negligence of Dominion for the jury to properly assess damages herein.  It matters not whether Fannie Mae would accept Barnett's opinion as an appraiser nor that there exists a linguistic difference in an appraiser's definition of fair market value and Barnett's statement the property is worth zero because there would be no willing buyers.  It was for the jury to access the credibility to be offered Barnett's opinion and assess damages.

**{¶246}**  The assignment of error is overruled.

VII. and VIII.

**{¶247}**  Appellant's seventh and eighth assignments of error assert the trial court erred in instructing the jury.

**{¶248}**  The standard of review for decisions relative to a trial court's giving of jury instructions is as follows,

**{¶249}**  "The decision to give a jury instruction is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. McCleod* (Dec. 12, 2001), 7th Dist. No. 00–JE–8, 2001 WL 1647305. Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140."

**{¶250}**  *Sicklesmith v. Chester Hoist*, 169 Ohio App.3d 470, 478, 2006-Ohio-6137.

**{¶251}**  Dominion argues the trial court erred in refusing to instruct the jury as to the applicable statute of limitations.  We disagree, as the complaint alleged Dominion's

actions were continuing and occurred over a number of years until the time of filing the complaint.

{¶252} Dominion asserts the jury should have been instructed as to proximate causation as an affirmative defense. Again, we disagree.

{¶253} The trial court instructed the jury on proximate causation as an element of the claim of negligence. Proximate causation is not an affirmative defense; it is an element of the Alfords' claim for negligence. Dominion's proximate causation argument relates to an apportionment of damages theory. We previously noted Dominion failed to carry its burden of proof with respect to apportionment.

{¶254} Dominion next asserts the trial court should have instructed the jury as to the theory of equitable estoppel based upon the Alfords' statements they were satisfied with the outcome of the erected building. The Alfords' statements were made to the Ohio EPA.

{¶255} Equitable estoppel requires a party prove another party made a factual misrepresentation, that is misleading, that induced actual reliance which is reasonable and in good faith; and the misrepresentation caused detriment to the relying party. *Doe v. Blue Cross/Blue Shield of Ohio* (1992), 79 Ohio App.3d 369.

{¶256} Following enclosure of the Clay Station, Dominion's Brent Breon advised the Alfords, via email, Dominion would review any other noise sources at the plant. He acknowledged Dominion's belief the noise may have been from testing and repair work at the Guernsey Station. Dominion asserts it detrimentally relied upon the Alford's statement to the Ohio EPA they were satisfied with the enclosure of the Clay Station.

However, noise, vibration and fumes continued to emanate from Dominion's operation of both stations.

**{¶257}** We do not find the Alfords' subsequent complaint of dissatisfaction based upon the ongoing overall noise, vibration and fumes created by both stations renders their previous statement to the Ohio EPA a misleading misrepresentation. Furthermore, Dominion's announced decision it would continue to review any other noise source, including the Guernsey Station, demonstrates it did not detrimentally rely upon the Alfords' statement. We find the trial court did not abuse its discretion in declining to instruct the jury on the theory of equitable estoppel.

**{¶258}** Dominion further asserts the trial court erred in its cumulative instruction to the jury. Specifically, Dominion maintains the trial court erred in instructing the jury as to temporary and permanent damages, damages for annoyance, inconvenience and injury. In light of our analysis of Dominion's prior assigned errors, it's arguments relative thereto, and the whole record, we do not find the trial court abused its discretion in its cumulative instruction to the jury.

**{¶259}** The seventh and eighth assignments of error are overruled.

CROSS ASSIGNMENT OF ERROR I

**{¶260}** In the first cross assignment of error, the Alfords assert the trial court erred in granting Dominion's directed verdict as to the Alfords' claims for punitive damages.

**{¶261}** R.C. 2315.21 governs the recovery of punitive damages in a tort action.

**{¶262}** "(C) Subject to division (E) of this section, punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

{¶263} "(1) The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

{¶264} "(2) The trier of fact has returned a verdict or has made a determination pursuant to division (B)(2) or (3) of this section of the total compensatory damages recoverable by the plaintiff from that defendant."

{¶265} The Supreme Court of Ohio has defined malice as "1) the state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge or, 2.) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty* (1987), 32 Ohio St.3d 334. Mere foreseeability cannot be equated with great probability. *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470. Great probability can be likened to high foreseeability. *Id.* There must be circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others the conduct may be called willful or wanton. *Motorists Mut. Ins. Co. v. Said*, (1993), 63 Ohio St.3d 690.

{¶266} Here it is undisputed Dominion operated legally under Ohio EPA permits, and the noise, fumes and vibration emission levels were allowed under the operating permits. The jury found there was no intentional infliction of emotional distress, and the evidence offered at trial indicates effort on the part of Dominion to mitigate the noise level. We agree with the trial court Dominions' actions are insufficient to demonstrate malice.

**{¶267}** The first assignment of error on cross appeal is overruled.

CROSS ASSIGNMENT OF ERROR II.

**{¶268}** In the second assigned error on cross appeal, the Alfords argue the trial court erred in excluding the sound level test results and related expert testimony even though the methodology was reliable; impermissibly weighing the credibility of the person conducting the tests.

**{¶269}** Prior to the start of trial, Dominion filed two separate motions in limine to exclude the testimony regarding sound measurements taken by the Alfords and to preclude Mr. Hannon, an alleged expert, from testifying regarding the measurements. The trial court granted the motion in limine as to the sound measurements, and found Mr. Hannon was not qualified to serve as an expert witness.

**{¶270}** Evidence Rule 702 reads,

**{¶271}** "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

**{¶272}** "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

**{¶273}** "(2) The design of the procedure, test, or experiment reliably implements the theory;

**{¶274}** "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶275} The trial court excluded the evidence based upon Ohio Rule of Evidence 702(C)(3).

{¶276} When performing its gatekeeping function, a trial court must evaluate the reliability and relevance of expert testimony, including ensuring the underlying tests and/or procedures are reliable. *Terry v. Caputo* (2007), 115 Ohio St.3d 351. The trial court must not only find the basic principles are reliable, but also the expert reliably applied the tested principles to the particular set of facts at issue. Id.

{¶277} The Alfords sought to introduce sound measurements taken by Erin Alford and Mr. Hannon. Erin Alford conducted the majority of the tests, with Mr. Hannon conducting the measurements for only one day. The trial court concluded the procedure was defectively designed, unreliable, and not able to produce accurate results and not implemented according to the design. The sound measurements purport to record the noise emanating from the Guernsey Compressor Station and the Clay Compressor Station.

{¶278} Mr. Hannon testified at trial he would not be able to testify as to the recordings taken by Erin Alford because he was not there to observe them. Tr. at 697. Further, Mr. Hannon testified the recordings did not make any distinction between the Clay Compressor Station, Guernsey Compressor Station, Dominion Transmission M&R Station, or Tennessee Gas Pipeline Station. Tr. at 1586, 1610. There was no method to distinguish between other sound sources. Id.

{¶279} Mrs. Alford recorded the sound measurements, omitting data such as location, wind speed and precipitation. Tr. at 687. Furthermore, Mr. Hannon testified at trial he never verified Ms. Alford performed the required pre and post-survey calibration.

He testified the device should be calibrated before each use, and could not have been properly calibrated because Erin Alford did not have the equipment to do so. Tr. at 688-697. Erin Alford further testified she did not memorialize the decibel reading for any of the dates she checked the calibration. Tr. at 1663.

{¶280} Based upon the above, we cannot find the trial court abused its discretion in granting the motions in limine excluding this testimony.

{¶281} The second assigned error on cross-appeal is overruled.

CROSS ASSIGNMENT OF ERROR III.

{¶282} In the third assigned error on cross appeal, the Alfords assert the trial court erred in granting Dominion's directed verdict as to their claim for absolute nuisance.

{¶283} Dominion asserts the Alford's complaint only alleges a claim for generic nuisance, not absolute nuisance. Rather, Dominion maintains the Alfords only alleged absolute nuisance when arguing against the motion for directed verdict. Dominion argues it was also the first time the Alfords cited Ohio Administrative Code Section 3745-15.07 as authority for absolute nuisance. The Alford's complaint does not state a claim for absolute nuisance and does not cite OAC Section 3745-15.07.

{¶284} Absolute nuisance encompasses activities consisting of "***either a culpable and intentional act resulting in harm, or an act involving culpable and unlawful conduct causing unintentional harm, or a nonculpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault." *Metzger v. Pennsylvania, Ohio & Detroit RR. Co.*, 146 Ohio St. 406 (1946). Generally, an absolute nuisance is engaging in activities that no matter

how careful on is, such activities are inherently injurious and cannot be conducted without damaging someone else's property or rights. *Brown v. Scioto Cty. Bd. Of Commrs.* , 87 Ohio App.3d 704 (1993).

**{¶285}** As set forth above, it is undisputed the Dominion compressor stations operated lawfully and according to certifications and permits. There was no evidence admitted Dominion was in violation of any permit or standard regarding emissions.

**{¶286}** Based upon the above, we find the trial court did not err in directing a verdict as to any claim for absolute nuisance herein.

**{¶287}** The third assigned error on cross appeal is overruled.

**{¶288}** The judgment of the Tuscarawas County Court of Common Pleas is affirmed in part; reversed in part; and remanded for further proceedings in accordance with the law and this opinion.

By: Hoffman, P.J.

Farmer, J. and

Delaney, J. concur