[Cite as *Triad Hunter, L.L.C. v. Eagle Natrium, L.L.C.*, 2024-Ohio-5188.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

TRIAD HUNTER, LLC,

Plaintiff-Appellee/Cross-Appellant,

v.

EAGLE NATRIUM, LLC, ET AL.,

Defendants,

and

WESTLAKE CHEMICAL CORPORATION

Defendant-Appellant/Cross-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MO 0019**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2018-149

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Robert M. Stonestreet* and *Atty. Timothy M. Miller*, Babst, Calland, Clements & Zomnir, PC, *Atty. John J. Kulewicz* and *Atty. Ilya Batikov*, Vorys, Sater, Seymour and Pease, LLP, *Atty. Constance H. Pfeiffer*, *Atty. R. Paul Yetter*, and *Atty. Tracy N. LeRoy*, Yetter Coleman, LLP, for Plaintiff-Appellee/Cross-Appellant and

*Atty. Louis A. Chaiten*, *Atty. James R. Saywell*, and *Atty. Yvette McGee Brown*, Jones Day, *Atty. Chad I. Michaelson*, Meyer, Unkovic & Scott, LLP, *Atty. William R.H. Merrill* and *Atty. Ryan V. Caughey*, Susman Godfey, L.L.P., for Defendant-Appellant/Cross-Appellee.

Dated:  October 29, 2024

**HANNI, J.**

{¶1}  Defendant-Appellant/Cross-Appellee, Westlake Chemical Corporation (Westlake), appeals from Monroe County Common Pleas Court judgments denying its motion for a judgment notwithstanding the verdict (JNOV) and denying its motion for a new trial following a jury verdict in favor of Plaintiff-Appellee/Cross-Appellant, Triad Hunter, LLC (Triad), on Triad's claims for negligence and trespass.  Triad cross-appeals from the trial court's judgments denying its claims for punitive damages and for a permanent injunction.

{¶2}  The trial court properly denied Westlake's motion for a JNOV and motion for a new trial.  The trial court also properly upheld all damages awarded by the jury.  These judgments are affirmed.  Additionally, the trial court correctly instructed the jury during the punitive damages portion of the trial, and the jury's determination of no punitive damages is affirmed.  Finally, because the trial court did not abuse its discretion in denying Triad's motion for a permanent injunction, this judgment is also affirmed.

Statement of Facts

{¶3}  Triad is a natural-gas producer that owns mineral rights underlying the "Ormet Property" in Monroe County.  It produces natural gas from the Marcellus and Utica Shale formations.  Triad's property is located just west of the Ohio River, in Ohio, where it has multiple natural gas wells.

{¶4}  Just east of the Ohio River, in West Virginia situated across the river from the Ormet Property, Westlake owns a salt mine and plant called the "Natrium Plant." Westlake, like its predecessors before it, injects high-pressure water and chemicals into injection wells thousands of feet underground to dissolve salt from the Salina formation, forming brine.  The brine is then brought to the surface from an extraction well and is used

to produce products such as chlorine, caustic soda, and PVC. Westlake acquired the business, and its licensed operator, Defendant Eagle Natrium (Eagle Natrium), in 2016 from Defendant Axiall Corporation (Axiall). Westlake retained all of the employees of the Natrium Plant.

{¶5} In the process of salt mining, once the solid salt is liquefied and removed, the remaining void is filled with pressurized brine, creating "brine caverns." These brine caverns grow in "fingers" or "tendrils" that extend for miles.

{¶6} Eagle Natrium obtained a lease from the State of West Virginia to mine for salt under the Ohio River in land owned by the state. Westlake continued with this mining.

{¶7} The Natrium Plant mines areas known as Fields 1, 2, and 3. This case involves Field 2, which extends west toward the Ormet Property. At issue here is whether the brine caverns from Field 2 that extend under the Ohio River reach the Ormet Property. In 2013 and 2014, there was concern that natural gas from the Ormet Property gas wells and brine from the Field 2 cavern had come in contact with each other.

{¶8} In 2017, when Triad attempted to drill two of the wells it had started in 2014 (the #9 well and the #10 well), its tools would not fit down the wellbore. An investigation showed that sometime after installation, the steel casing in both wells had buckled. An expert determined this buckling had occurred at the depth of the Salina formation and had been caused by the earth's compaction in that area. Triad later perforated the #10 well and found brine, instead of the solid earth that should have been there.

{¶9} Later in 2017, Triad began to drill a new well, the #7 well. But while drilling, large cuttings of salt were removed from the wellbore indicating instability. Drilling into this salt released $H_2S$, an odorless, colorless, poisonous gas. Due to the gas detections, Triad had to temporarily evacuate the well site. Eventually, it had to undertake a different, more costly approach, to drill the #7 well. Triad encountered similar circumstances in drilling the #11 and #4 wells.

{¶10} Triad then determined that it could not safely drill five additional planned wells in the Marcellus formation. Triad's expert opined these canceled wells resulted in lost profits of $95 million over 50 years.

{¶11} In April 2018, Triad filed a complaint against Westlake, Eagle Natrium, and Axiall, asserting claims for negligence, trespass, nuisance, conversion, unjust

enrichment, and injunctive relief. Triad claimed that the Defendants' solution-mining operations were negligently performed and that they intruded underneath Triad's property.

**{¶12}** The case ultimately went to a jury trial in October 2022, on the negligence and trespass claims. Triad dismissed its remaining substantive claims. At the close of evidence, Westlake moved for a directed verdict, which the court overruled. At the conclusion of the 13-day trial, the jury found Eagle Natrium and Axiall not liable on either claim. It found Westlake liable on both claims. The jury awarded Triad $70,140,472 in damages. The matter then proceeded to the punitive-damages phase. There, the jury rejected Triad's claim for punitive damages, awarding no punitive damages.

**{¶13}** Westlake moved for JNOV, a new trial, and remittitur of damages on June 22, 2023. The trial court denied all three.

**{¶14}** Triad also sought a permanent injunction to enjoin Westlake from the continued solution mining on one of its fields. The trial court denied the request for an injunction on September 12, 2023. It found no evidence that the continued use of the field resulted in a continued trespass or that it would cause irreparable harm to Triad's operations.

**{¶15}** Westlake filed a timely notice of appeal on October 30, 2023. Triad filed a timely notice of cross-appeal on November 9, 2023. We will first address the appeal, followed by the cross-appeal.

<u>Westlake's Appeal</u>

<u>First Assignment of Error</u>

**{¶16}** Westlake raises three assignments of error. It's first assignment of error states:

THE TRIAL COURT ERRED IN DENYING JNOV.

**{¶17}** Westlake argues the trial court should have granted its motion for a JNOV.

**{¶18}** An appellate court reviews a decision to grant or deny a motion for JNOV under a de novo standard of review. *Environmental Network Corp. v. Goodman Weiss*

*Miller, L.L.P.*, 2008-Ohio-3833, ¶ 23.

**{¶19}** A motion for JNOV under Civ.R. 50(B) tests the legal sufficiency of the evidence. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 25 (a motion for JNOV presents a question of law); *Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976) (motions for JNOV employ the same standard as motions for directed verdict). Thus, when a verdict has been returned for the plaintiff, the trial court, in determining whether to sustain a motion for judgment notwithstanding the verdict, must decide whether the defendant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the plaintiff. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679 (1998), citing Civ.R. 50(A)(4). In determining whether to grant or deny a Civ.R. 50(B) motion, the trial court should not weigh the evidence or evaluate the credibility of the witnesses. *Malone v. Courtyard by Marriott*, 74 Ohio St.3d 440, 445 (1996).

**{¶20}** Westlake breaks this assignment of error into three issues.

**{¶21}** First, Westlake argues that Triad was required to, and failed to, present expert testimony to prove negligence in the operation of a subsurface salt mine. It contends the question of how to properly conduct mining activity falls outside of the common knowledge of a layperson. Westlake acknowledges that Triad presented many other experts about other subjects, but argues that Triad failed to present an expert on the industry standards and the standard of care applicable to salt mining and brine production. It contends such an expert was required in order to prove the negligence claim.

**{¶22}** A negligence claim requires the plaintiff to prove: (1) duty; (2) breach of duty; (3) causation; and (4) damages. *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84 (1996).

**{¶23}** Whether a defendant owes a duty to a plaintiff depends upon the foreseeability of the plaintiff's injury. *Gerace Flick v. Westfield Nat. Ins. Co.*, 2002-Ohio-5222, ¶ 26 (7th Dist.), citing *Menifee v. Ohio Welding Products*, 15 Ohio St.3d 75, 77 (1984). "An injury is foreseeable if a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Id.*

**{¶24}** To prove causation, the plaintiff must prove that the defendant's conduct is

both the actual cause and the proximate cause of its damages.

{¶25} The test for actual causation is a "but for" test. *Cincinnati Bell Tel. Co., LLC v. J.K. Meurer Corp.*, 2022-Ohio-540, ¶ 31 (1st Dist.), citing *Anderson v. St. Francis St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84 (1996). Stated differently, Westlake's conduct is the actual cause of Triad's damages if the damages would not have occurred but for Westlake's conduct. *Id.*

{¶26} As to proximate cause:

> Proximate causation means "some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered." *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St.3d 609, 618, 653 N.E.2d 661 (1995), quoting Keeton, Dobbs, Keeton, & Owen, *Prosser and Keeton on the Law of Torts*, Section 41, 263 (5th Ed.1984). The harm must be foreseeable, meaning the harm was the natural and probable consequence of the act. *Mussivand [v. David]*, 45 Ohio St.3d [314,] at 321, 544 N.E.2d 265.

*Id.* at ¶ 32.

{¶27} The trial court found the following regarding the evidence. The plant operators knew that solution mining caused the brine caverns to grow in all directions. The plant operators knew the caverns had grown past Westlake's property boundaries and extended under the Ohio River. The operators did not know exactly how far the brine caverns extended but understood that they could affect mines in Ohio. Despite this knowledge, the plant operators failed to take further action to ascertain how far the brine caverns had extended. (September 12, 2023 JE, p. 8-10).

{¶28} The court further found that in 2017 and 2018, Westlake knew that 200 billion gallons of water that it pumped underground were unaccounted for but it did not investigate where that water had travelled to. Westlake decided not to conduct seismic mapping of the brine caverns despite being told by state regulators that it was of "utmost importance." Reports showed Westlake's caverns were "connected" to Triad's wells, yet Westlake continued to mine Field 2. Westlake knew of measures it could take to prevent

its caverns from growing west into Ohio but failed to take any action. (September 12, 2023 JE, p.13-14).

{¶29} Given this evidence the jury was able to understand, without the aid of expert testimony, that Westlake would have anticipated that an injury was likely to result to Triad from Westlake's act of continuing to mine Field 2 without taking any actions to prevent its brine caverns from spreading into Triad's property. As the Ohio Supreme Court once explained:

> 'Except for malpractice cases (against a doctor, dentist, etc.) there is no general rule or policy requiring expert testimony as to the standard of care, and this is true even in the increasingly broad area wherein expert opinion will be received. * * * Courts could very easily expand the area in which expert testimony is required to establish the standard of conduct, but the tendency has been instead to resolve doubtful questions in favor of allowing the jury to decide the issue of negligence without its aid. * * *'

*Thompson v. Ohio Fuel Gas Co.*, 9 Ohio St.2d 116, 118 (1967), quoting 2 Harper and James on The Law of Torts 966, Section 17.1, page 966.

{¶30} Additionally, the jury would be able to understand, without the aid of an expert, that Westlake's conduct was the cause of Triad's damages, or that the damages would not have occurred but for Westlake's conduct. The First District has also explained when expert testimony is required to prove causation:

> Expert testimony is necessary to prove "causation between a plaintiff's injuries and the defendant's conduct" when the issues of causation involve a scientific inquiry. *Clough v. Watkins*, 4th Dist. Washington No. 19CA20, 2020-Ohio-3446, 2020 WL 3447762, ¶ 32, citing *Darnell v. Eastman*, 23 Ohio St.2d 13, 261 N.E.2d 114 (1970), syllabus. But when "the cause and effect relationship is 'so apparent as to be matters of common knowledge,' then expert testimony is unnecessary." *Clough* at ¶ 32, citing *Darnell* at syllabus.

*Cincinnati Bell Tel. Co.*, 2022-Ohio-540, ¶ 33 (1st Dist.). In this case, the cause and effect

Case No. 23 MO 0019

relationship between Westlake's actions and Triad's damages was apparent without the aid of an expert's testimony.

**{¶31}** In a somewhat similar negligence case requiring the jury to determine whether emission of fumes, noise, and vibrations from the defendant's compressor damaged the plaintiffs, the Fifth District found "while the details of the machinery were technical, whether it was reasonable to subject the Alfords to excessive noise, vibration, and fumes was not." *Alford v. E. Ohio Gas Co.*, 2014-Ohio-2134, ¶ 62 (5th Dist.). The court therefore determined expert testimony was not required to prove the negligence action. *Id.*

**{¶32}** Analogously, in this case, while expert testimony was necessary to explain the workings of a salt mine, how brine caverns grow, and other related issues, expert testimony was not necessary to prove the actual elements of the negligence action.

**{¶33}** Moreover, Westlake goes so far as to concede that, when viewing the evidence in a light most favorable to Triad as we are required to do when reviewing the denial of a JNOV, the evidence demonstrated that Westlake: (1) had no idea and did not want to ask how far west their brine caverns extended; (2) knew the brine cavern could reach Triad's property; and (3) consciously decided not to get certain information to assess the risk. (Brief of Defendant-Appellant, p. 21). Westlake also admits that this can be evidence that it should have known that the brine cavern would reach Triad's property and can be viewed as "willful blindness" on its part. (Brief of Defendant-Appellant, p. 22).

**{¶34}** Thus, Westlake's first issue under this assignment of error lacks merit.

**{¶35}** Second, Westlake argues that Triad was required to, and failed to, prove the element of intent in its trespass claim. It claims Triad, and the trial court, invented a new tort of "negligent trespass." Intentional conduct, Westlake asserts, is an essential element of trespass.

**{¶36}** We agree with Westlake that intentional conduct is an element of trespass. We further agree that there is no cause of action for "negligent trespass." In this case, however, the court was clear that the jury had to find intentional conduct on Westlake's part in order to find that a trespass occurred.

**{¶37}** "[I]ntentional conduct is an element of trespass: 'One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally

protected interest of the other, if he *intentionally* (a) enters land in the possession of the other or causes a thing or a third person to do so * * *.' (Emphasis added.)" *Baker v. Shymkiv*, 6 Ohio St.3d 151, 153 (1983), quoting Restatement of Torts 2d 277, Section 158. Both the Ohio Supreme Court and this Court have held that intentional conduct is an element of trespass. *Id.*; *Merino v. Salem Hunting Club*, 2008-Ohio-6366, ¶ 44 (7th Dist.).

**{¶38}** The trial court correctly instructed the jury, *pursuant to Westlake's requested instruction*, on the elements of trespass, including intent:

> To establish this claim [trespass], Triad must prove beyond the greater weight of the evidence that Eagle Natrium, Axiall, and/or Westlake intentionally entered upon Triad's property without permission from Triad.

> "Intentionally" means that Eagle Natrium, Axiall, and/or Westlake either desired to cause the consequences of its act, or believed that the consequences of its act were substantially certain to result from that act.

(Tr. 3145). Thus, Triad had to prove to the jury that Westlake believed that continuing to inject into Field 2 was substantially certain to cause its brine cavern to reach Triad's property.

**{¶39}** As to the trespass claim, the trial court summarized the evidence presented at trial as follows:

> [T]he jury herein heard ample evidence that Westlake had an intent to trespass, or that it knowingly went upon Triad's property or believed it was substantially certain that it was entering upon Triad's property.

> (1). First, the evidence established when Westlake bought Axiall and Eagle Natrium and took over operation of the plant in 2016, Westlake acquired the historical knowledge of Axiall and Eagle Natrium employees. In 2017, West Virginia regulators shared the historical maps with the plant. Also, after receiving notice from the regulators, Westlake's Stephen Clark reviewed some prior studies and reports on cavern growth in order to

respond to regulators, after Westlake had taken over plant operations. This data included:

* 2001 study where the "resulting drawing clearly shows the western edge of the salt cavities for all three brine fields extending beyond the banks of the Ohio River."

* 2002 study estimating that 4 million tons of salt -- about 15% of the salt mined at the plant as of 1998- had been removed from under the river.

* 2003 study alerting of connections to the Marcellus formation and that the fields "have become extremely large and resulted in roof falls and cavity rubble," and stating that, "The existing brine fields are very mature and efforts should be to retire them."

* 2010 report stating that the caverns are growing to the southwest and west and "will continue to propagate up-dip" from injection wells, and recommending seismic [sic] in West Virginia and Ohio, and

* 2014: Natrium Well 28 unexpectedly hits a 16-foot cavern that should not have been there.

(2). The evidence further established that Westlake knew that the vast amounts of water it injects into the ground for mining "has to go somewhere." It knew its "field is going to grow in all directions." Indeed, it knew that Field 2 was growing to the west, toward and into Ohio. It also knew 200 million gallons of water were "unaccounted for" in 2017 and 2018 alone.

(3). The evidence also established that Westlake also knew that pressure tests showing a lockstep or synchronization between wells shows a connection. In 2018, after pressure tests for Field 1 and 3 no longer moved in lockstep, Westlake knew the caverns no longer were connected. Once Triad disclosed Dr. Nagel's August 31, 2020 reports showing the

lockstep movement between Triad's well and Field 2, the jury could find that Westlake recognized that as proof given its own experience with correlation of pressure data in Fields 1 and 3. Westlake's own solution mining expert agreed that the pressures in Triad's wells and Field 2 changed "in lockstep."

(4). The evidence also showed that in 2017, West Virginia regulators told Westlake to tell Ohio regulators about wells in Ohio that might be impacted by the plant's brine caverns. It did not do so. West Virginia regulators even noted that Westlake's maps show its caverns under the Ohio, so they asked for "all mineral leases that allow the mining of the Salina formation," including "the lease with the State of West Virginia for the area being mined under the Ohio River." At that time, there was no lease. Five years later, Jerry Mullens signed a lease for the plant to mine West Virginia's property under the river.

(5). The evidence also showed that Westlake was aware that West Virginia regulators "have had some real concerns about where the caverns are" over the past five years. In 2017, it decided against doing 3D seismic mapping of their caverns despite being told by West Virginia regulators that getting "accurate boundary maps" was of "utmost importance." Westlake told the regulators that it just didn't know precisely where the boundaries are.

Later in 2017, Westlake requested a proposal from DMT Technologies for a survey of the cavern boundaries using a Z-scan. The work was authorized for only "on the plant site" east of the river. DMT confirmed that they would map the cavern everywhere "except where it is under the Ohio River."

(6). Last, the evidence established that Westlake also prepared a draft policy about cavern integrity, but it decided not to adopt this or any other cavern integrity police for this plant.

(Sept. 12, 2023 JE, p. 8-10).

Case No. 23 MO 0019

{¶40} The evidence supports the trial court's summation.

{¶41} Triad presented evidence that once salt is liquefied the empty caverns are filled with brine. (Tr. 1544-1545). The brine caverns then grow in "fingers" or "tendrils" that go on for miles. (Tr. 1544-1545). The Field 2 brine cavern grows to the west, towards Triad's property. (Tr. 198-200, 1082-1083; Ex. 302). Field 2 has an extremely large cavern that has suffered from roof collapses, which in turn caused connections between the Salina salt formation and the Marcellus shale formation. (Tr. 220-221; Ex. 44; Ex. 85).

{¶42} Triad then presented evidence that in 2003, the Natrium Plant hired a solution mining expert who advised the plant to retire Field 2 due to the caverns growing very large due to their age and high-flow volume. (Tr. 221; Ex. 84). Despite this warning, the Natrium Plant continued to mine Field 2. (Tr. 2087-2088).

{¶43} In 2013, Ohio regulators raised concerns that the Natrium Plant's wells contained natural gas, indicating that there was "communication" between the brine cavern and the Marcellus formation. (Tr. 1533-1539; 2138-2142; Ex. 46). Axiall contacted West Virginia regulators in 2014, expressing concerns about fracking and the effect on its salt mining. (Tr. 1533-1539, 2138-2142). It was then that Axiall proposed a "zone of extreme caution" that extended one mile around its brine cavern boundaries, which includes Triad's property. (Tr. 2075; Ex. 46).

{¶44} Westlake acquired the Natrium Plant in 2016. Stephen Clark remained as the plant's project engineer along with the other plan operators. These operators knew about the brine caverns communicating with Triad's wells. (Tr. 1533-1539, 2138-2142).

{¶45} In 2017, the West Virginia Department of Environmental Protection sent its third notice to the Natrium Plant instructing it to provide an accurate boundary of the brine caverns due to safety concerns. (Tr. 253-254; Ex. 62). It further instructed the Plant to report to Ohio regulators that oil and gas wells in Ohio might be impacted by the brine caverns. (Ex. 62). Consequently in 2017, Westlake requested a survey of its brine caverns to the east of the Ohio River; but it did not seek to survey the area west of the Ohio River into Ohio. (Tr. 277-278, 425; Ex. 72). This was despite the fact that it knew the West Virginia regulators wanted a map of all of the boundaries. (Tr. 206, 454-455). Additionally, Westlake did not inform Ohio regulators that oil and gas wells in Ohio could

be impacted by the brine caverns. (Tr. 260-261; Ex. 62; Video Tr. 28-32). Moreover, from 2015-2018, Westlake could not account for a quarter billion gallons of water it injected into Field 2. (Tr. 474-475, 1566-1570, 1720-1727; Ex. 155).

**{¶46}** Also in 2017, Triad resumed drilling its #9 well and #10 well but found its tools would not fit down the wellbore. (Tr. 573-574, 586-587). An investigation revealed that the steel casing in both wells had buckled and were crushed at the depth of the Salina salt formation. (Tr. 773-774; Ex. 406, Ex. 177). Triad's expert testified this occurred due to the compaction in the Salina formation. (Tr. 765-767, 769). As a result, no tools could fit into the wells and Triad had to abandon them. (Tr. 590-592, 785, 1298). Upon later inspection, Triad perforated the #10 well at the Salina depth and found brine instead of the solid salt that should have been there. (Tr. 628-630; Ex. 426). Testing of the brine revealed that it was similar in chemistry to the brine in Westlake's wells. (Tr. 637-643, 840-841, 853-854).

**{¶47}** Later that year, Triad began to drill the #7 well. Upon drilling, large cuttings of salt were removed from the wellbore indicating instability. (Tr. 603-604, 1304-1305). Additionally, $H_2S$ gas, a poisonous odorless gas was detected at high levels. (Tr. 600-601). The levels were so high that Triad was forced to evacuate the site. (Tr. 601-603). Due to the poisonous gas, Triad had to use more costly drilling measures in order to keep its employees safe. (Tr. 604). Upon resuming drilling, workers next encountered pressurized brine coming out of the wellbore. (Tr. 605-607). Triad attempted to cement the section of the well where the pressurized brine was coming from but realized that the cement was disappearing into the Salina formation. (Tr. 618-619).

**{¶48}** Based on this evidence, Triad proved that Westlake acted intentionally, i.e., with substantial certainty that its actions of continuing to inject into Field 2 were substantially certain to cause a trespass into Triad's property. Thus, Westlake's second argument under this assignment of error lacks merit.

**{¶49}** Finally, Westlake states that Triad proved, at most, that Westlake knew the brine cavern of Field 2 would increase in size and knew that it had grown past its property lines and under the Ohio River. It argues this does not equate to intent to trespass. Instead, Westlake claims this shows only recklessness. Moreover, it states that Triad presented evidence as to Westlake's uncertainty as to where the brine caverns were

located. It contends, then, the jury could not conclude that Westlake was certain that the brine caverns were under Triad's property.

{¶50} Trespass is an intentional tort. "[A]n intentional tort occurs when '* * * the actor desires to cause consequences of his act, or * * * he believes that the consequences are substantially certain to result from it.'" *Harasyn v. Normandy Metals, Inc.*, 49 Ohio St.3d 173, 175 (1990), quoting 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A.

{¶51} As to this issue, the trial court found:

> Here, the undisputed evidence revealed Westlake's ongoing actions involved injecting large volumes of water which it knew would increase the size of the brine caverns. Since it knew the field had grown past its property lines, this Court finds continuing to solution mine and refuse to take steps to control the cavern's growth equates to its direct intent to trespass.

(Sept. 12, 2023 JE, p. 11).

{¶52} As discussed in detail above, the evidence supports a finding of intentional conduct to support a claim of trespass. Westlake's intent can be inferred from its decision to continue to inject into Field 2 with knowledge that the brine caverns had spread past its property boundaries and under the Ohio River, the caverns were "communicating" with Triad's property, and the caverns would continue to increase in size and spread further. Thus, Westlake's third argument under this assignment of error lacks merit.

{¶53} Accordingly, Westlake's first assignment of error is without merit and is overruled.

Second Assignment of Error

{¶54} Westlake's second assignment of error states:

THE COURT ERRED IN DENYING A NEW TRIAL.

{¶55} Westlake contends here that the jury rendered an inconsistent verdict requiring a new trial. Westlake asserts that all of the evidence used to support its liability applies equally to co-defendant Eagle Natrium, which was the Plant's licensed operator

at all relevant times. If it operated the Plant negligently, Westlake states, then so did Eagle Natrium. And if it operated the plant with substantial certainty that Field 2 was intruding onto Triad's property, then so did Eagle Natrium.

**{¶56}** Westlake claims it was not an error to have the defendants listed separately on the verdict forms, thus there could be no invited error as the trial court found. Westlake argues the error here has nothing to do with verdict forms or jury charge. Instead, it claims the error is that the jury rendered a factually inconsistent verdict that was not supported by the evidence. Westlake asserts that one operator cannot be liable while the other operator is not.

**{¶57}** Pursuant to Civ.R. 59(A)(6), a new trial may be granted on the grounds that the judgment is not sustained by the weight of the evidence. A new trial may also be granted in the sound discretion of the court for good cause shown. Civ.R. 59(A).

**{¶58}** A trial court's decision to overrule a motion for a new trial is reviewed for abuse of discretion. *Mannion v. Sandel*, 91 Ohio St.3d 318, 321 (2001). Abuse of discretion implies that the court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). We defer to the trial court who witnessed the testimony first-hand. *Mannion*, at 321. Thus, in reviewing the trial court's denial of a motion for a new trial based upon a factual question, we construe the evidence in a light most favorable to the trial court's action rather than to the original jury's verdict. *Jenkins v. Krieger*, 67 Ohio St.2d 314, 320 (1981); *Rohde v. Farmer*, 23 Ohio St.2d 82, 94 (1970).

**{¶59}** Relevant to this assignment of error, the trial court found:

> Moreover, this Court finds that Westlake waived, at trial, any objection to a Verdict holding Westlake alone liable. More specifically, Defendants herein asked this Court to adopt a charge that allowed the Jury to reach a different Verdict as to each individual Defendant. Likewise, Defendants did not object to the final Jury charge and Verdict forms that such a Verdict would be in error.
>
> . . .

Defendants herein initially proposed Jury interrogatories and Verdict forms that would separate out the three companies and allow the Jury to make independent liability findings as to each. In presenting proposed Jury Instructions, the parties differed about how to refer to Defendants. Triad proposed referring to them as "Defendants," while Defendants asked to be listed separately as "Eagle Natrium, Axiall and Westlake." Defendants also agreed that the Jury could find Westlake liable if the Jury concluded that it had an "active role at the plant" when the damage occurred:

[Triad] witnesses can only say that it might have happened some time between 2014 and 2017, and the Jury is most certainly entitled to conclude that Westlake had no active role at the plant when the damage occurred, or vice versa.

Importantly, Westlake never raised its new claim that it could be liable only if one or more of its co-defendants were. It proposed no instruction or Verdict form that predicates its liability on that of Eagle Natrium or Axiall.

The final jury charge, interrogatories, and verdict forms incorporated defendants' requests that they be referred to separately and that the jury make separate liability findings as to each defendant. Since no one said otherwise, the final jury charge, interrogatories, and verdict forms did not require the jury to find Eagle Natrium or Axiall liable before finding Westlake liable.

. . .

Here, Westlake asked for a jury charge that allowed the jury to find it liable without finding Eagle Natrium or Axiall liable.

(Sept. 12, 2023 JE, p. 6-7).

**{¶60}** The fact that Westlake asked for jury instructions so that the jury could consider each defendant's potential liability separately, suggests that Westlake was a

proponent of the theory that the jury could find each individual defendant liable or not liable, independently of the other defendants. It is disingenuous to now argue the jury could not possibly find it liable without also finding Eagle Natrium liable.

**{¶61}** But more important is the stipulation entered into by all of the parties. The parties stipulated to the ownership history of the Natrium Plant. Prior to January 2013, the Plant was owned by PPG Industries. (Tr. 2221, Stipulation No. 1). From January 2013 until August 31, 2016, the Plant was owned by Eagle Natrium, which is a wholly owned subsidiary of Axiall. (Tr. 2221, Stipulation No. 1). Effective August 1, 2016, Westlake purchased Axiall, which included Eagle Natrium. (Tr. 2221, Stipulation No. 2). Since then, Westlake has been operating the Natrium Plant. (Tr. 2223, Stipulation No. 9). Thus, pursuant to Westlake's own stipulation, in 2016 it purchased Axiall and Eagle Natrium, and Westlake has been operating the Natrium Plant since that time.

**{¶62}** And the testimony indicated that Westlake employees ran the Natrium Plant from 2016 forward. The jury heard from multiple witnesses that the Plant employees remained at the Plant after Westlake purchased it and became employees of Westlake. (Tr. 130-132, 1999; Video Tr. 20; Video Tr. 9).

**{¶63}** In addition to the above, we must be mindful that in reviewing a trial court's decision to overrule a motion for new trial, we are to (1) defer to the trial court since it witnessed the trial and (2) to construe the evidence in the light most favorable to the trial court's ruling. *Mannion*, 91 Ohio St.3d at 321; *Jenkins*, 67 Ohio St.2d at 320; *Rohde*, 23 Ohio St.2d at 94. Given this standard and the substantial evidence that Westlake had been running the Natrium Plant since 2016, in addition to the fact that Westlake requested jury instructions whereby each individual defendant could be found liable on its own, we cannot find that the trial court acted arbitrarily, unreasonably, or unconscionably in overruling Westlake's motion for a new trial.

**{¶64}** Accordingly, Westlake's second assignment of error is without merit and is overruled.

### Third Assignment of Error

**{¶65}** Westlake's third assignment of error states:

THE COURT ERRED UPHOLDING ALL DAMAGES.

**{¶66}** In its final assignment of error, Westlake raises three issues.

**{¶67}** First, Westlake argues Triad should have, and failed to, present an expert to prove the issue of causation related to its alleged inability to complete the drilling of its wells. It asserts expert testimony was required to prove damages in three areas: (1) undrilled wells in the Marcellus formation (damages of $30,657,620); (2) lost profits for the #9 well (damages of $6,002,165); and (3) increased drilling costs for the #4, #7, and #11 wells (damages of $11,561,606). Westlake contends there was no way for a juror to make decisions on these complex issues without expert guidance. The costs of drilling and the proper safety measures to take in these circumstances are matters beyond the jury's common knowledge, claims Westlake.

**{¶68}** When reviewing a damages award, an appellate court must not reweigh the evidence, and may not disturb an award of damages unless it lacks support from any competent and credible evidence. *Bako v. Crystal Cabinets Works, Inc.*, 2001-Ohio-3244 (7th Dist.), citing *Bemmes v. Public Emp. Retirement Bd.*, 102 Ohio App.3d 782, 788 (12th Dist. 1995).

**{¶69}** As to whether expert testimony was required to show causation related to Triad's inability to drill its wells, it has been held:

> Expert testimony is necessary to prove "causation between a plaintiff's injuries and the defendant's conduct" when the issues of causation involve a scientific inquiry. *Clough v. Watkins*, 4th Dist. Washington No. 19CA20, 2020-Ohio-3446, 2020 WL 3447762, ¶ 32, citing *Darnell v. Eastman*, 23 Ohio St.2d 13, 261 N.E.2d 114 (1970), syllabus. But when "the cause and effect relationship is 'so apparent as to be matters of common knowledge,'" then expert testimony is unnecessary." *Clough* at ¶ 32, citing *Darnell* at syllabus.

*Cincinnati Bell Tel. Co., LLC v. J.K. Meurer Corp.*, 2022-Ohio-540, ¶ 33 (1st Dist.).

**{¶70}** In this case, Triad presented testimony, both expert and otherwise, that when taken as a whole demonstrated that its injuries were caused both by Westlake's

negligence and trespass. Once the evidence established that Westlake's failure to monitor and control where its brine caverns spread and that these brine caverns caused damage to Triad's gas well operations, it was within the jury's common knowledge to determine that Westlake's negligence caused Triad's damages.

{¶71} For ease of discussion, we will address each of the three damages awards that Westlake takes issue with separately. Also, we note that Westlake does not take issue with the calculation of the amount of damages here. Instead, it argues that Triad needed to present an expert to prove the issue of causation related to its alleged inability to complete the particular wells discussed below.

{¶72} First, Westlake takes issue with the award for undrilled wells in the Marcellus formation (damages of $30,657,620). As to this issue, the trial court disagreed with Westlake's argument that Triad could not recover lost profits for the five Marcellus wells because it failed to hire an expert to offer an opinion that it was unsafe to drill the wells.

{¶73} Westlake also argues that this damages award was based on speculation. Westlake asserts Triad presented no evidence of any harm to the area where the Marcellus wells would have been drilled. Instead, Westlake claims, Triad only offered speculation that a void in one location on its property might affect the shale 900 feet above in a different area of its property. It points to testimony from Matt Rucker that he had no "hard evidence" to prove the Marcellus formation was un-drillable and that the only way to determine if there was damage was by conducting a 3-D seismic study, which was not done. (Tr. 1370-1376).

{¶74} Contrary to Westlake's arguments, the trial court found substantial evidence to support the award for the undrilled wells in the Marcellus formation:

> First, the evidence established that it is without dispute that drilling near a brine cavern is dangerous. Westlake themselves had concerns about fracking in close proximity to their plant because in 2013 Triad's fracking caused a huge public safety issue on and near the plant. Additionally, in 2014 Axiall sued to stop an oil and gas operator from drilling wells to the east of the plant due to huge concerns for safety risks.

Next, this Court finds that the Jury was presented with substantial evidence of the scientific reasons why drilling in Marcellus formation near a brine cavern is risky and unsafe. Evidence was offered from Triad fact witnesses as well as experts including Dr. Nagle and Kevin Hill on the topics of drilling dangers and how caverns form and grow and how they affect the Marcellus formation. There was also testimony that the caverns under Plaintiff's property had caused rock layers above the caverns to subside, purportedly causing the casing in wells 9 and 10 to deform.

Additionally, the Jury heard from Reservoir Engineer David Bailey, Austin Clark, and Matt Rucker of Triad about the compromised integrity of the Marcellus, the effect of drilling in a compromised formation, and that the presence of caverns could cause subsidence, roof collapse and connectivity between gas in the Marcellus and the caverns.

(September 12, 2023 JE, p. 14-15).

{¶75} As the trial court found, the evidence supports the jury's damages award for lost profits for the undrilled wells in the Marcellus formation.

{¶76} Geomechanics expert Dr. Neal Nagel testified that when Westlake injects fresh water, which is less dense than salt water, into the salt layer the water dissolves the salt up and out at the top of the salt formation. (Tr. 1498-1512). This practice causes the cavern to expand over time and provides less support, which can lead to the rock above it to collapse. (Tr. 1496-97, 1518-1525). When this rock collapses, the cavern can access what lies above, including the Marcellus formation. (Tr. 1497, 1529-1530). Moreover, Dr. Nagel testified that as the expanding brine caverns grow the Marcellus formation above it begins to flex. (Tr. 1536-1539). This flexing makes the otherwise tight formation open up and become permeable. (Tr. 1536-1539). Dr. Nagel explained this allowed pressure from Triad's fracking in 2013 to result in gas from the Marcellus formation to reach the Natrium Plant's wells. (Tr. 1536-1537). And he testified that because of the brine caverns underneath the #9 well, the roof of that cavern was unsupported causing it to buckle. (Tr. 1697-1698).

{¶77} Triad's petroleum engineer, David Bailey, testified Triad determined that

drilling into the Marcellus formation from the upper pad was unsafe because the salt was removed from the Salina formation below the upper pad, which weakened the formation's integrity and could cause the Marcellus formation to collapse. (Tr. 969-972). Thus, he stated that drilling the Marcellus wells would have created a safety concern. (Tr. 969-972).

**{¶78}** And Triad's former vice president of resource development and planning, Matt Rucker testified that brine caverns could cause roof collapses and connectivity between gas in the Marcellus formation and the brine caverns. (Tr. 1427-1428). This connectivity, Rucker stated, could cause damages to the stability of the rocks above the Salina formation, which is where the Marcellus formation is located. (Tr. 1267-1268).

**{¶79}** Based on the above, there is competent, credible evidence that it was unsafe to drill the wells in the Marcellus formation, contrary to Westlake's argument.

**{¶80}** Next, Westlake takes issue with the award for lost profits for the #9 well (damages of $6,002,165). The trial court found credible evidence to support this award:

> Westlake argues that increased costs and lost profit for the no. 9 well were caused by a low-pressure zone in the formation unrelated to its caverns. However, Triad presented evidence at trial that the increased costs were due to deformed casing caused by the caverns. The jury was entitled to believe this evidence.

> The combined testimony of well casing expert David Lewis and Dr. Nagel showed that the deformed casing in no. 9 and no. 10 wells was caused by cavern roof moving down which "squished" the casing. Rucker testified that, due to the deformed casing in the no. 9 well, Triad could no longer fit regular-sized drilling tools down the casing to drill further into the formation to complete and frac[k] the well. Triad tried to use smaller drilling tools, but these smaller tools were not able to penetrate sufficiently. Had the casing not been deformed, Rucker testified, Triad could have used regular-sized drilling tools to drill to depth and complete the wells.

(September 12, 2023 JE, p. 17).

Case No. 23 MO 0019

{¶81} Competent, credible evidence exists on the record to support the award for lost profits for the #9 well.

{¶82} As noted above, Dr. Nagel testified that because of the brine caverns underneath the #9 well, the roof of that cavern was unsupported causing it to buckle. (Tr. 1697-1698). And Rucker testified that because of this, Triad could not fit its drilling tools down the casing to the #9 well because the casing had become deformed. (Tr. 1431-1432). Rucker stated that drilling the #9 well then became impossible because only smaller drilling tools could fit down the casing and they were not the tools required for this particular well. (Tr. 1240-1241).

{¶83} As the trial court pointed out, Triad presented competent, credible evidence to support its theory that Westlake's brine caverns caused the damages to the #9 well so that it could not be drilled.

{¶84} Finally, Westlake takes issue with the award for increased drilling costs for the #4, #7, and #11 wells (damages of $11,561,606). Once again, the trial court found ample evidence to support this award:

> Triad witnesses Clark and Rucker testified about the cavern's impact when drilling the no. 7 well. He offered that Triad hit an area that caused high levels of deadly hydrogen sulfide to be released requiring a crew evacuation. In completing this well, the testimony established that Triad needed extra time to drill and used a different type of cement to handle the H2S. The evidence also established that Triad took similar steps when drilling well no. 11 and well no. 4 with Rucker testifying that Triad wanted to take extra precautions to ensure the safety of its crew. Given this evidence, this Court finds that the Jury could reasonably find that Triad's decision to expend extra money for safety reasons was reasonable.

(September 12, 2023 JE, p. 17-18).

{¶85} The evidence supports these findings by the trial court.

{¶86} Dr. Nagel testified that Westlake's brine cavern extended at least as far as the #7 well on the upper pad. (Tr. 1600). When Triad began drilling the #7 well, large salt cuttings came up from the wellbore. (Tr. 603, 1304-1305). Clark testified this

indicated that the zone was unstable. (Tr. 604). Drilling then released $H_2S$, a poisonous gas, with levels so high Triad had to evacuate the upper pad for the safety of its workers. (Tr. 600-603). In order to safely continue drilling the #7 well, Triad had to undertake additional measures, which made the project much more expensive. (Tr. 610-617). And when Triad began to drill the #11 well, it again found large salt cuttings. (Tr. 624-625). This resulted in Triad needing to take many of the same safety measures in drilling the #11 well as it did for the #7 well. (Tr. 1322-1323). Also, when Triad began to drill its next well, the #4 well, it put the extra safety measures in place because it was the first well to drill through the Salina formation from the lower pad and Triad wanted to ensure its workers' safety. (Tr. 1321, 1325-1326). Triad also presented the jury with authorizations for money spent to safely drill the #4, #7, and #11 wells due to the brine caverns. (Tr. 1301-1328; Exs. 141-145).

{¶87} Thus, Triad presented competent, credible evidence to support the finding of causation as to the #4, #7, and #11 wells.

{¶88} Finally, Westlake argues the trial court erred in failing to consider the excessiveness of the award here before denying remittitur. It claims the court applied the wrong legal standard, looking at whether there was evidence of passion or prejudice by the jury and whether the verdict was supported by the manifest weight of the evidence. Westlake argues the jury's award was excessive given that Triad pursued its claims against three companies, yet it was the only one found liable. Additionally, it claims the damages were speculative.

{¶89} An appellate court reviews a trial court's decision to deny remittitur for abuse of discretion. *Betz v. Timken Mercy Med. Ctr.*, 96 Ohio App.3d 211, 218 (5th Dist. 1994). "The assessment of damages is a matter within the province of the jury." *Carter v. Simpson*, 16 Ohio App.3d 420, 423 (10th Dist. 1984). Thus, it is not proper for this court to substitute our opinion for that of the jury. *Litchfield v. Morris*, 25 Ohio App.3d 42, 44 (10th Dist. 1985).

{¶90} A remittitur is appropriately granted when (1) a jury has determined the unliquidated damages; (2) the jury's verdict was not influenced by passion or prejudice, but the verdict was excessive; and (3) the prevailing party consents to the reduction in the damages. *Wray v. Allied Indus. Dev. Corp.*, 2002-Ohio-5214, ¶ 14 (7th Dist.) citing,

Case No. 23 MO 0019

*Wightman v. Consolidated Rail Corp.*, 86 Ohio St.3d 431, 444 (1999).

**{¶91}** In its opinion, the trial court set out the four criteria stated above that are necessary for a court to order a remittitur. (Sept. 12, 2023 JE, p. 2). It further explained that whether an award is excessive must be based on the facts found by the jury. (Sept. 12, 2023 JE, p. 2).

**{¶92}** Later in its opinion, the trial court stated:

"In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive." *Moskovitz v. Mount Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655, 635 N.E.2d 331 (1994). Here, this Court finds that the fact that the Jury did not award the full damages sought by Triad in each category of damages indicates no passion, prejudice, or other basis to disturb the Verdict. This Court finds that evidence existed to support the Jury's findings and their Verdict which this Court finds demonstrated the objective and thoughtful consideration of each category of damages requested by Triad.

The record herein is void of any evidence of passion or prejudice by the Jury or that the Verdict was against the manifest weight of the evidence. The Jury did not award all the damages requested by Triad. Westlake's request that this Court remit the unanimous Verdict of the Jury is denied.

(Sept. 12, 2023 JE, p. 18).

**{¶93}** The trial court applied the correct standard in denying remittitur. The court found there was no passion or prejudice. It also found there was no other basis to disturb the verdict and that the evidence supported the jury's verdict. This was akin to finding that the award was not excessive. The court also pointed out that the jury did not award all of the damages requested by Triad, thereby demonstrating the jury's careful consideration of damages and again supporting a finding that the award was not excessive. Thus, the trial court properly applied the remittitur standard and did not abuse

Case No. 23 MO 0019

its discretion on this issue.

**{¶94}** Accordingly, Westlake's third assignment of error is without merit and is overruled.

<u>Triad's Cross-Appeal</u>

<u>First Cross-Assignment of Error</u>

**{¶95}** Triad raises two cross-assignments of error in its cross-appeal.

**{¶96}** Triad's first cross-assignment of error states:

THE TRIAL COURT INSTRUCTED THE JURY INCORRECTLY AND ALLOWED INADMISSIBLE EVIDENCE ON PUNITIVE DAMAGES.

**{¶97}** In its first cross-assignment of error, Triad askes for a new punitive damages trial.

**{¶98}** First, Triad argues that, on Westlake's request, the trial court gave an improper instruction on the definition of "malice."

**{¶99}** The Ohio Jury Instructions (OJI) provide:

"Actual malice" necessary for an award of punitive damages is

(Use appropriate alternative[s])

(A) a state of mind characterized by hatred, ill will, or a spirit of revenge;

(or)

(B) a conscious disregard for the rights and safety of another person that has a great probability of causing substantial harm.

1 OJI-CV 315.37, citing *Preston v. Murty*, 32 Ohio St.3d 334 (1987); *Moskovitz, Exr. v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638 (1994).

**{¶100}** Over Triad's objection, the trial court instructed the jury on both definitions of "actual malice."

Case No. 23 MO 0019

**{¶101}** Triad argues the trial court was required to instruct the jury on only the second of the two alternatives. It argues the court was obligated to pick only one of the two alternative definitions and not to present the jury with both. It contends that Westlake focused its case on arguing that it did not act with "hatred" or "ill will" when Triad's argument all along was not that Westlake acted with this intent but instead that Westlake acted with a "conscious disregard" for Triad's rights and safety. Triad argues the "hatred" and "ill will" was not appropriate to put before the jury at all because that was never its allegation. It claims by giving the jury this other definition of "actual malice", the trial court confused the jury into thinking Triad had to prove hatred or ill will in order to recover punitive damages.

**{¶102}** "A determination as to which jury instructions are proper is a matter left to the sound discretion of the trial court, and thus, a trial court's formulation of the instructions is upheld absent an abuse of discretion." *B & B Contrs. & Developers, Inc. v. Olsavsky Jaminet Architects, Inc.*, 2012-Ohio-5981, ¶ 101 (7th Dist.), citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). We must consider the jury instructions as a whole in evaluating whether the court acted unreasonably, unconscionably, or arbitrarily. *Id.*, citing *State v. Jalowiec*, 91 Ohio St.3d 220, 231 (2001).

**{¶103}** The Ohio Supreme Court set out the relevant law on a jury instruction for actual malice:

> We therefore hold that actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. In the latter case, before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety. If submitted to the jury, the trial court should give an instruction in accordance with the law we announce today.

*Preston v. Murty*, 32 Ohio St.3d at 336.

**{¶104}** In this case, the trial court instructed the jury:

> You are not required to award punitive damages to Triad, and you may not do so unless you find that Triad has met its burden to prove by clear and convincing evidence that Westlake's actions demonstrated actual malice.

> Actual malice necessary for an award of punitive damages in this case, is a state of mind characterized by hatred, ill will, or a spirit of revenge or a conscious disregard for the rights and safety of another person that had a great probability of causing substantial harm.

(Punitive Tr. 274).

**{¶105}** The court was clear that the jury need only find one of the two alternatives in order to find actual malice. It in no way suggested that the jury was required to find the evidence supported both of the alternative definitions in order to award punitive damages. A jury is presumed to follow the court's instructions. *Pang v. Minch*, 53 Ohio St.3d 186, 195 (1990). Thus, we may presume the jury considered both alterative definitions of actual malice and found neither was supported by the evidence.

**{¶106}** Additionally, the alternative actual malice instructions have been given in other cases even where the evidence only supported one of the two malice alternatives. For instance, in *Irvine v. Akron Beacon Journal*, 2002-Ohio-2204, ¶ 56 (9th Dist.), the Ninth District did not take issue with the trial court's actual malice instruction as "a state of mind characterized by hatred, ill will, or a spirit of revenge or a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." This was despite the fact that the court found there was *no* evidence of hatred or ill will. *Id.* at ¶ 57. It found only that there was ample evidence that the defendant acted in conscious disregard to the rights of others and that its conduct had a great probability of causing substantial harm. *Id.*

**{¶107}** Thus, we cannot conclude that the trial court abused its discretion here in its instruction regarding actual malice.

**{¶108}** Given our resolution of the issue regarding the instruction on actual malice, Triad's remaining two issues under this assignment of error are rendered moot. These issues further address alleged errors regarding the instructions on punitive damages. But without a finding of actual malice, there can be no punitive damages award. Nonetheless, we will touch upon these issues.

**{¶109}** In its second issue under this assignment of error, Triad argues that the trial court erroneously instructed the jury on the "reprehensibility" factors found in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), over its objection. (Punitive Tr. 8-10, 37). These factors, Triad argues, are for courts to consider when reviewing a punitive damages award for excessiveness, not for the jury to consider.

**{¶110}** In *Campbell*, the United States Supreme Court examined the framework to consider when reviewing whether a punitive damages award is unconstitutionally excessive. In accordance with its concerns, the Court referred to its prior decision in *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 575 (1996), where it

> instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Campbell*, 538 U.S. at 418. The Court then set out five factors for courts to consider in determining the reprehensibility of a defendant in this context: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 419, citing *Gore*, 517 U.S. at 576-577.

**{¶111}** The comments to the Ohio Jury Instructions, 1 OJI CV 315.37, on punitive damages provide in relevant part:

Case No. 23 MO 0019

The supreme courts of the United States and Ohio addressed the constitutionality of punitive damages in *Gore v. BMW of North America, Inc.*, 517 U.S. 559 (1996); *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113; and *Barnes v. University Hospitals of Cleveland*, 119 Ohio St.3d 173, 2008-Ohio-3344. The Supreme Court of Ohio in *Barnes* held that a court reviewing an award of punitive damages must independently analyze three factors to determine whether the award is constitutional: (1) the degree of reprehensibility of the party's conduct; (2) the ratio of punitive damages to the actual harm inflicted; and (3) the difference between the award and civil sanctions authorized for similar misconduct. The factors controlling an award of punitive damages apply to post-verdict review by trial and appellate courts and should not be included in jury instructions.

**{¶112}** Thus, the comments mention, as Triad points out, that these three factors for determining the constitutionality of a punitive damages award are to be applied by courts reviewing the award and are not part of the jury instructions.

**{¶113}** However, Instruction 11 for punitive damages then specifically provides:

11. AMOUNT OF PUNITIVE DAMAGES. If you award punitive damages, it should be presumed that the plaintiff has been made whole for his/her/its injuries by the award of compensatory damages. In determining the amount of punitive damages, you may consider all of the following:

(A) the harm caused was physical as opposed to economic;

(B) the tortious conduct evinced an indifference or a reckless disregard of the health or safety of others;

(C) the target of the conduct had financial vulnerability;

(D) the conduct involved repeated actions or was an isolated incident; and

(E) the harm was a result of intentional malice, trickery or deceit, or mere accident. The amount you award should be fair and reasonable and should not be influenced by passion or prejudice.

1 OJI CV 315.37. The comment to this instruction states that it is drawn from *State Farm v. Campbell*, 538 U.S. 408.

{¶114} Reading the Ohio Jury Instructions and the relevant comments as a whole, leads to two conclusions. First, the trial court *is not* to use the three constitutionality factors ([1] the degree of reprehensibility of the party's conduct; [2] the ratio of punitive damages to the actual harm inflicted; and [3] the difference between the award and civil sanctions authorized for similar misconduct) in the jury instructions. And second, the trial court *is* to use the reprehensibility of a defendant factors ([1] whether the harm caused was physical as opposed to economic; [2] whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] whether the target of the conduct had financial vulnerability; [4] whether the conduct involved repeated actions or was an isolated incident; and [5] whether the harm was the result of intentional malice, trickery, or deceit, or mere accident) in the jury instructions.

{¶115} The trial court's instruction in this case track the Instruction 11 OJI language:

In determining the amount of punitive damages, you may consider all of the following. The harm caused was physical as opposed to economic; the tortious conduct evicts an indifference or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery or deceit, or mere accident.

(Punitive Tr. 275). Moreover, the court made clear the jury was only to consider these factors if they needed to determine the amount of punitive damages, which they never even got to. Thus, the trial court did not abuse its discretion in including this instruction to the jury.

{¶116} In its third issue under this assignment of error, Triad asserts that the

Case No. 23 MO 0019

alleged erroneous jury instruction above led to another error where the trial court admitted into evidence the financial statements of Triad's past and present parent companies. (Punitive Tr. 38). This evidence, Triad argues, was irrelevant, inadmissible, and prejudicial. It contends Westlake used this improper evidence to paint Triad's parent companies as greedy and not financially vulnerable.

**{¶117}** As set out above, the trial court properly instructed the jury on the five reprehensibility factors, one of which is whether the target of the conduct had financial vulnerability. Thus, the evidence Triad claims is irrelevant is relevant as to this factor.

**{¶118}** Accordingly, Triad's first cross-assignment of error is without merit and is overruled.

Second Cross-Assignment of Error

**{¶119}** Triad's second cross-assignment of error states:

> THE TRIAL COURT ERRONEOUSLY DENIED PERMANENT INJUNCTIVE RELIEF.

**{¶120}** Triad filed a request for a permanent injunction to stop Westlake from solution mining on "Field 2." The trial court held a permanent injunction hearing on August 22, 2023, which also incorporated the evidence from trial. The court denied the permanent injunction in its September 12, 2023 judgment. In support, the trial court referred to the reasons it gave on the record:

> The Court in this case finds based on the record before it, previous testimony – previous evidence and today's testimony, there is no evidence before this Court that the continued use of Field 2 by the Defendants is this case is a limited capacity will cause irreparable harm to the Plaintiff's operations. There is no evidence that Defendants have reneged on any plan or any series of things that they promised this Court and the jury that they would do.
>
> The record reflects that this Field 2 is being used as backup when 1 and 3 are being tended to for service or inspection, or when they are being

used – when they cannot be used because another well is being drilled first on Field 1 and then on Field 3.

There is no evidence in the record of a continued trespass. There is zero evidence that something could happen to the Plaintiff's wells. If the Plaintiffs were harmed further in some capacity, this Court finds they have an adequate remedy at law by way of money damages.

The evidence is that their property is fully developed; they have been compensated by the jury in this case by way of compensatory damages for – and that was based on trespass finding, and that broken down for past and future money damages.

So based on those things, the Court finds that the Plaintiff had not met their burden by clear and convincing evidence for a permanent injunction[.]

(Injunction Tr. 119-120).

**{¶121}** Triad now asserts the trial court should have granted its request for a permanent injunction.

**{¶122}** Triad first claims the trial court incorrectly found that Westlake's continued use of Field 2 in a limited capacity is not itself evidence of irreparable harm. It argues that the fact the jury found Westlake had committed a trespass is itself the irreparable harm required for a permanent injunction. Triad claims that any further injection into Field 2 constitutes a continuing trespass into its property.

**{¶123}** Triad next claims the trial court incorrectly found the verdict already compensated it for its future damages and that if it were harmed further, it would have an adequate remedy at law. Triad asserts that a permanent injunction is the only remedy that will prevent its future damages. It argues that future lawsuits do not constitute an adequate legal remedy as they would be impractical and waste judicial resources.

**{¶124}** An appellate court reviews the grant or denial of a permanent injunction for an abuse of discretion. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 73 Ohio St.3d 590, 604 (1995).

Case No. 23 MO 0019

**{¶125}** A permanent injunction is an equitable remedy only to be granted where there is irreparable injury and no adequate remedy at law such as monetary damages. *Martin v. Lake Mohawk Property Owner's Ass'n*, 2005-Ohio-7062, ¶ 48 (7th Dist.). A party seeking a permanent injunction must prove by clear and convincing evidence that the injunction is necessary to prevent irreparable harm and that the party does not have an adequate remedy at law. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-268 (1st Dist. 2000). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

**{¶126}** First, Westlake is correct that a finding by a jury that a trespass has occurred does not necessarily lead to a finding of clear and convincing evidence that a permanent injunction is necessary to prevent irreparable harm. *See Novy v. Ferrera*, 2014-Ohio-1776, ¶ 57 (11th Dist.); *Lee v. Barber*, No. CA2000-02-014 (12th Dist. July 2, 2001). The burden of proof is higher for a permanent injunction than for a jury verdict on trespass. Clear and convincing evidence is the burden for a permanent injunction. Yet to prove a trespass claim the burden is only a preponderance of the evidence. The Ohio Supreme Court has defined "clear and convincing evidence" as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. at paragraph three of the syllabus. Because the burden of proof is higher in a permanent injunction case than in a jury trial on a trespass claim, a jury verdict on a trespass claim does not automatically prove the plaintiff is entitled to a permanent injunction.

**{¶127}** Additionally, the trial court correctly found here that Triad has an adequate remedy at law should it incur further damages. The jury awarded Triad damages for both past *and future* damages caused by Westlake's trespass. The jury awarded Triad over $70 million dollars in damages. This included damages for lost profits spanning the next 50 years. And no evidence indicated that if Triad suffered damages above and beyond what it was already compensated for that it would not be able to recover at law for such damages.

{¶128} Based on the above, the trial court did not abuse its discretion in denying the permanent injunction.

{¶129} Accordingly, Triad's second cross-assignment of error is without merit and is overruled.

{¶130} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Robb, P.J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**